# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## ASHEVILLE DIVISION

### CIVIL CASE NO. 1:06cv372

| | | |
|---|---|---|
| **RANDY LYNN ATKINS,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | **MEMORANDUM OF** |
| **v.** | ) | **DECISION AND ORDER** |
| | ) | |
| **MARVIN POLK, Warden,** | ) | |
| **Central Prison** | ) | |
| **Raleigh, North Carolina,** | ) | |
| | ) | |
| **Respondent.** | ) | |
| _____ | ) | |

**THIS MATTER** is before the Court upon Petitioner Randy Lynn Atkins's Amended Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254. [Doc. 10]. Also before the Court are Respondent's Motion for Summary Judgment [Doc. 19] and Petitioner's Motion for Summary Judgment [Doc. 28].

## I.     STATEMENT OF FACTS

On April 12, 1993, Petitioner was indicted for first degree sexual offense and for the first-degree murder of his eight-month-old son, Lyle James Atkins. State v. Atkins, 349 N.C. 62, 73, 505 S.E.2d 97, 104 (1998). On November 18, 1993, Petitioner pled guilty to first-degree murder in exchange for the dismissal of the sexual offense charge and an agreement by the State not to submit any evidence at sentencing pertaining to the sexual offense charge or to any other sexual offenses purportedly committed by Petitioner. Id. at 73, 505 S.E.2d at 104-05. Following acceptance and entry of Petitioner's guilty plea, a capital sentencing hearing was conducted during the November 29, 1993 Criminal Session of the Superior Court for Buncombe County, before the Honorable Chase Saunders. Id. at 74, 505 S.E.2d at 105. Petitioner was represented by William Auman and Curtiss Graham, both Buncombe County Assistant Public Defenders.

The facts of this case are summarized in the North Carolina Supreme Court's opinion on Petitioner's direct appeal:

> Defendant, Lyle, and Lyle's mother were living together . . . at the Lazywood Mobile Home Park in Buncombe County.

Lyle's mother, Ms. Colleen Shank, testified that on the morning of 16 March 1993, she asked defendant to watch Lyle while she washed some clothes. Ms. Shank stated that she heard a "bang." Following the "bang," Ms. Shank heard Lyle begin to cry, and she rushed to the living room. Ms. Shank testified that she then observed defendant hitting Lyle's head against the trailer wall a "few times." She testified further that she saw defendant "swing him [Lyle] very strong" and that "Lyle hit the wall very hard." Ms. Shank tried to comfort Lyle and attempted to lay the child down to rest. However, Lyle soon began to cry, and Ms. Shank noted that he was turning blue. The mother administered CPR and requested that defendant go to a neighbor's home to call 911 for emergency assistance.

Defendant then went to the home of a neighbor and called 911. The 911 operator testified that defendant responded to her questions concerning medical history related to Lyle's emergency by replying "it [Lyle] may have been sick two or three days, but no other." Lyle's mother testified that while waiting for emergency personnel to arrive, defendant told her, "Don't say anything, because I will hurt you too."

Following the arrival of emergency medical personnel, Lyle was transported by helicopter to Mission Memorial Hospital in Asheville. Upon admission to the hospital, Lyle was noted to be limp, not moving, and exhibiting a slow heart rate. The admitting physician noted numerous injuries to the small child, including bruising on both sides of his head, an older bruise on his left elbow, bruising on his right wrist and right hand, a deformation of his pelvis, and an improperly healed fracture of his right lower leg.

A detective from the Woodfin Police Department questioned defendant and Ms. Shank in the waiting room of the hospital. Defendant initially told the officer that Lyle had stopped breathing "because of the Ker-O-Sun heater." Defendant responded to the officer's further inquiry by adding that "a couple of days ago I was holding him, and he slipped and fell, and he hurt his arm." The officer subsequently arrested both defendant and Ms. Shank and transported them to the Buncombe County jail. Later that day, while in police custody, defendant issued a written statement in which he admitted the following:

> Today Lyle was crying as I was holding him, and my temper and patience snapped again, as he was crying and crying no matter how soothing and gentle I was. He just kept crying, and I couldn't handle him any more, and I started hitting him on the side of his head and trying to get him to stop crying, and he wouldn't. I kept telling him to stop it, and he wouldn't, and I kept on hitting him with my hand on his head.

Despite aggressive medical efforts to save Lyle's life, he died at Asheville's Mission Memorial Hospital on 18 March 1993.

Id. at 73-74, 505 S.E.2d at 105.

During the capital sentencing proceeding, the State presented evidence in support of one of the statutory aggravating circumstances, namely, that the murder was "especially heinous, atrocious, or cruel." See

4

N.C. Gen. Stat. § 15A-2000(e)(9). The State Supreme Court summarized

the State's evidence as follows:

> An experienced pediatric radiologist testified at the sentencing proceeding concerning the extent of injuries suffered by Lyle. The testimony indicated that the eight-month-old infant exhibited the following injuries upon admission to Mission Memorial Hospital on 16 March 1993: healing fracture of the right clavicle, healing bone along the midshaft of the right upper arm, extensive injury of the left upper arm, dislocation of the left elbow, healing bone indicative of a fracture of the right hip, skull fractures and bruising on both the left and right sides, and a compression fracture of the spine. Further testimony indicated that the injuries occurred in at least two episodes of injury to Lyle. The pediatric radiologist estimated that the time of the origin of injuries ranged from four weeks prior to the hospital admission up to within a day of the admission. Several treating physicians also testified at the sentencing proceeding that Lyle exhibited symptoms of "battered child syndrome." The State presented expert testimony by Dr. Cynthia Brown, a pediatrician, who defined a "battered child" as a "child that presents with multiple purposely inflicted injuries that are of varying ages."

Atkins, 349 N.C. at 74-75, 505 S.E.2d at 105-06.

With respect to Petitioner's mental health, evidence was presented

during the sentencing phase that in April 1993, Dr. Clabe Lynn diagnosed

Petitioner as having a personality disorder and adjustment disorder with a

mixed disturbance of emotions and conduct. Id. at 75, 505 S.E.2d at 106.

There was also testimony presented from Dr. Joseph Horacek, who testified that it was his opinion that Petitioner suffered from a disassociative identity disorder, also known as multiple personality disorder, as well as an attention deficit disorder. Dr. Horacek also opined that Petitioner exhibited a "learning disability profile." Id. at 87, 505 S.E.2d at 113.

In all, Petitioner presented evidence of twenty-five potential mitigating circumstances in addition to the statutory "catchall" mitigating circumstance, N.C. Gen. Stat. § 15A-2000(f)(9). The jury rejected all of these potential mitigating circumstances except for two, finding that (1) "the Defendant qualifies as having a learning disability due to his IQ variations," and (2) "the Defendant was diagnosed by Dr. Clabe Lynn in April of 1993 as having a personality disorder and adjustment disorder with a mixed disturbance of emotions and conduct." Atkins, 349 N.C. at 75, 505 S.E.2d at 106. On December 8, 1993, the jury unanimously recommended that Petitioner be sentenced to death. Id.

## II.    PROCEDURAL HISTORY

In recounting the procedural history of this case, the Court will refer to those records manually submitted by the Respondent as "Resp't Ex. __"

and those records manually submitted by the Petitioner as "Pet'r Ex. ___."

These citations will include a reference to the relevant page number and/or

paragraph number, and where necessary, a description of the particular

document cited.[1]

## A.    Direct Appeal

Following entry of judgment and his sentence of death, Petitioner

filed an appeal in the North Carolina Supreme Court.  During the pendency

of that appeal, Petitioner filed a Motion for Appropriate Relief (Pre-Appeal

MAR) alleging ineffective assistance of counsel for failing to take steps to

accommodate his hearing impairment during his various state court

proceedings.  [Resp't Ex. 1 at 265 ¶4.  The North Carolina Supreme Court

remanded the Pre-Appeal MAR to the Buncombe County Superior Court

for an evidentiary hearing and held Petitioner's appeal in abeyance

pending the outcome of the Superior Court proceedings.  [Id. at 265 ¶5].

As part of the Pre-Appeal MAR, on October 23, 1996, Petitioner filed

a Motion for Discovery in the Buncombe County Superior Court.  [Resp't

---

[1]In conjunction with the filing of his habeas petition, and in anticipation that the Respondent would file the transcripts of the state court proceedings, Petitioner filed a motion seeking to expand the record to include an additional four volumes of state court records.  [Doc. 4].  There was no opposition to Petitioner's motion, and for cause shown, Petitioner's Motion for Expansion of the Record was granted.  [Doc. 35].  The Court considered the exhibits manually filed in support of Petitioner's Petition as part of the record in this case.

Ex. 1 at 242-43].  On November 21, 1996, the Honorable Ronald K. Payne, Superior Court Judge Presiding, entered an Order granting Petitioner access to various investigative and prosecutorial files related to the case. [Id. at 254-55].  On November 27, 1996, Judge Payne entered an Order requiring the State to produce all work product for an in camera review by the Court.  [Id. at 252-53].  On December 11, 1996, Judge Payne entered an Order excluding the material provided for in camera review from discovery and requiring the State to continue to comply with the requirements of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).  [Id. at 256].  On January 15, 1997, the North Carolina Supreme Court denied Petitioner's petition for a writ of certiorari to review Judge Payne's discovery order.  [Id. at 259].

An evidentiary hearing was conducted before the Honorable Forrest Ferrell, who issued an Order on May 16, 1997, denying Petitioner relief on his Pre-Appeal MAR.  [Id. at 270].  Subsequently, the North Carolina Supreme Court affirmed Petitioner's conviction and sentence on direct appeal.  See State v. Atkins, 349 N.C. 62, 505 S.E.2d 97 (1998). Specifically, the North Carolina Supreme Court found no error in Petitioner's trial or in the denial of his Pre-Appeal MAR and further found

that the imposition of the death penalty was not disproportionate.  Id.

Petitioner filed a petition for writ of certiorari in the United States Supreme

Court, which was denied on June 1, 1999.  Atkins v. North Carolina, 526

U.S. 1147, 119 S.Ct. 2025, 143 L.Ed.2d 1036 (1999).

### B.    Post-Conviction Review by the State Courts

On April 17, 2000, Petitioner filed a post-conviction Motion for

Appropriate Relief (MAR), raising several claims, including: (1) a claim that

trial counsel rendered ineffective assistance by failing to investigate and

obtain adequate and necessary mental health expert assistance, including

the failure to request a continuance in order to do so (MAR Claim II); (2) a

claim that trial counsel failed to make certain offers of proof, request

curative instructions, and make objections to the State's arguments (MAR

Claim III); (3) a claim that the prosecutor presented "false light" testimony

and failed to reveal the deal with its chief witness Colleen Shank (MAR

Claim IV); and (4) a claim that the prosecution failed to disclose mitigating

and exculpatory evidence in violation of Defendant's State and Federal

constitutional rights (MAR Claim V).  [Pet'r Ex. 5].

On September 15, 2000, Petitioner filed his first amendment to his

MAR (First Amended MAR), raising the additional claim that he received

ineffective assistance of counsel due to counsel's failure to adequately investigate or to present sentencing phase testimony regarding Petitioner's childhood history of neglect, abuse and trauma (MAR Claim VII)[2]. [Pet'r Ex. 6].

The State filed an Answer to Petitioner's MAR on September 21, 2000, asserting that the claims raised therein were procedurally barred. [Resp't Ex. 4]. The State did not respond at that time to the claim asserted in Petitioner's First Amended MAR, but later did so on January 17, 2001. [Resp't Ex. 9].

On November 30, 2000, the Honorable Dennis J. Winner entered an Order ordering an evidentiary hearing on a portion of MAR Claim III (MAR Claim III.E), as well as Claims IV, V and VII. [Resp't Ex. 5]. The other claims asserted by Petitioner in the MAR were denied. [Id.].

On December 15, 2000, the State filed a motion for summary denial of all the claims asserted in Petitioner's MAR. [Resp't Ex. 6]. On December 18, 2000, Judge Winner entered an Order granting the State's motion in part. In addition to denying the claims that already had been

---

[2]This claim was misnumbered as Claim VI in the First Amended MAR. [Pet'r Ex. 6 at 4]. The original MAR, however, already included a Claim VI. [Pet'r Ex. 5 at 42]. Therefore, for ease of reference, this Order refers to the claim raised in the First Amended MAR as Claim VII.

denied in the November 30, 2000 Order, Judge Winner summarily denied all of MAR Claim III and MAR Claim IV. Judge Winner concluded that an evidentiary hearing was still necessary with respect to MAR Claim V and MAR Claim VII. [Resp't Ex. 7].

On January 12, 2001, the State filed a Motion for Summary Denial of Petitioner's First Amended MAR, addressing Claim VII on the merits for the first time. [Resp't Ex. 9].

On February 12, 2001, the parties appeared before the Honorable Zoro J. Guice, Jr. for a hearing on a motion filed by Petitioner for postconviction discovery. Judge Guice denied Petitioner's motion, and a written Order was entered to that effect on February 28, 2001. [Resp't Ex. 10]. Petitioner filed a petition for a writ of certiorari in the North Carolina Supreme Court seeking interlocutory review of Judge Guice's order, which the North Carolina Supreme Court denied on March 27, 2001. State v. Atkins, 353 N.C. 382, 547 S.E.2d 443 (2001).

On March 28, 2001, Petitioner filed a Motion to Reconsider Judge Winner's Order of November 30, 2000, a Motion to Require Assistance to Randy Atkins to Compensate for Hearing Difficulties at His Evidentiary

Hearing, and a Verified Motion to Allow Affidavits and Alternative Motion to Continue and Allow Depositions.  [Pet'r Exs. 12, 13].

On April 2, 2001, a hearing was held before Judge Guice on Petitioner's motions.  At that time, Judge Guice reversed Judge Winner's Order granting the evidentiary hearing with respect to First Amended MAR Claim VII.  [Pet'r Ex. 14 at 43].  Specifically, Judge Guice found that Judge Winner had not ruled on the merits of this claim but merely had ordered an evidentiary hearing because he had not had sufficient information before him at the time that he entered the Order.  [Id.].  Judge Guice orally granted the State's Motion for Summary Denial of this claim.  [Id.].[3]  Petitioner's request to make an offer of proof of the evidence he would have presented at an evidentiary hearing on First Amended MAR Claim VII was denied.  [Id. at 44].  Judge Guice did, however, grant Petitioner's request for an assisted listening device and continued the evidentiary hearing on MAR Claim V so that a listening device could be provided.  [Resp't Ex. 23].  Petitioner filed a petition for a writ of certiorari seeking review of Judge Guice's April 25, 2001 Order, which the North Carolina Supreme Court denied, noting that MAR Claim V remained unresolved pending an

---

[3]On April 25, 2001, Judge Guice entered a written Order summarily denying this claim on the merits and on grounds of procedural bar.  [Resp't Ex. 13].

evidentiary hearing.  See State v. Atkins, 354 N.C. 221, 554 S.E.2d 344 (2001).[4]

An evidentiary hearing on Petitioner's MAR Claim V was set for March 11, 2002, but was continued at Petitioner's request.  On October 10, 2003, Judge Guice entered an Order setting the evidentiary hearing on MAR Claim V for November 17, 2003.  On November 17, 2003, Petitioner's post-conviction counsel, Kenneth Rose, filed a motion to withdraw pursuant to N.C. Gen. Stat. § 7A-451(e).  Judge Guice granted Rose's motion and on January 2, 2004, appointed Paul M. Green and Jonathan L. Megerian to represent Petitioner.  Judge Guice gave Petitioner sixty days to file any ineffective assistance claims against appellate counsel Rose.  [Resp't Ex. 15].  On February 29, 2004, Judge Winner granted Petitioner's new attorneys an extension of time until April 1, 2004 to file any new ineffective assistance claims against Rose.

On March 31, 2004, Petitioner filed a Second Amendment to his MAR (hereinafter "Second Amended MAR"), asserting that trial counsel failed to adequately investigate and present mitigation evidence at sentencing and that appellate counsel failed to assert on appeal this ineffectiveness by trial

---

[4]The caption of this Order erroneously refers to the Petitioner as "Randy Lynn *Adkins*."

13

counsel.  Petitioner noted that these claims included matters previously raised in Claim VII, which was asserted in the First Amended MAR.  [Pet'r Ex. 7].  The State filed a response and a Motion for Summary Denial of these new claims.  On June 22, 2004, Judge Winner granted the State's Motion for Summary Denial and denied the new claims asserted in the Second Amended MAR.  [Pet'r Ex. 4 I].

On December 1, 2005, Judge Winner held an evidentiary hearing on MAR Claim V.  Petitioner presented a number of documentary exhibits, as well as the testimony of lead trial counsel William Auman; Woodfin Police Detective David Crompton, who was the lead investigator on the case; forensic psychiatrist Seymour Halleck, M.D.; and Joan Podkul, a mitigation investigator.  [Pet'r Exs. 9, 10].  At the conclusion of the hearing, Judge Winner orally denied relief, and on December 12, 2005, he entered a written order memorializing his decision denying Petitioner relief on this claim.  [Resp't Ex. 17].

Petitioner appealed Judge Winner's order to the North Carolina Supreme Court, which denied certiorari on October 5, 2006.  See State v. Atkins, 360 N.C. 649, 636 S.E.2d 811 (2006).

## C. Section 2254 Petition

On November 16, 2006, Petitioner filed with this Court a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 [Doc. 1], along with a Motion for Expansion of the Record [Doc. 4], and a Motion for Appointment of Habeas Counsel [Doc. 3]. On December 19, 2006, the Court entered an Order giving Petitioner thirty days to file an amended habeas petition that complied with Rule 2 of the Rules Governing Section 2254 Cases in the United States District Courts or risk having his habeas claims adjudicated on the facts appearing on the face of his habeas pleadings. [Doc. 9]. Petitioner filed the present Amended Petition for Writ of Habeas Corpus on January 18, 2007. [Doc. 10].

In his Amended Petition, Petitioner raises the following grounds for relief: (1) that he received ineffective assistance of counsel in the capital sentencing proceeding (Claim I); (2) that the state failed to disclose evidence materially favorable to him with respect to capital sentencing (Claim II); (3) that he was denied a full and fair opportunity to impeach his co-defendant's testimony by the state's failure to disclose its deal with her and by the trial court's limitation of counsel's cross-examination of her (Claim III); (4) that he was shackled without cause during the capital

sentencing hearing (Claim IV); and (5) that he was tried at the capital sentencing hearing without adequate measures to compensate for his hearing impairment (Claim V). [Doc. 10 at 16-52]. Petitioner requests that this Court vacate his death sentence and direct the State of North Carolina to impose a sentence of life imprisonment or to conduct a capital resentencing hearing within a reasonable time. Alternatively, Petitioner seeks an evidentiary hearing, discovery, further expansion of the record, or such other procedures as necessary to develop the factual record in support of his claims. [Doc. 10 at 52].

On March 23, 2007, Respondent filed an Answer [Doc. 18] and a Motion for Summary Judgment [Doc. 19]. On May 1, 2007, Petitioner filed a Reply to Respondent's Answer [Doc. 27] and a Motion for Summary Judgment [Doc. 28]. On May 2, 2007, Petitioner filed a Motion to Amend and Correct Petitioner's Summary Judgment Motion in order to correct a typographical error [Doc. 30], which the Court granted [Doc. 35]. On May 16, 2007, Respondent filed a Response to Petitioner's Motion for Summary Judgment. [Doc. 31].

The issues have been fully briefed, this matter is now ripe for disposition.

## III.   STANDARD OF REVIEW

For those claims raised by Petitioner that were adjudicated on their merits by the state courts, this Court's review is limited by the deferential standard of review set forth in the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 28 U.S.C. § 2254, as construed by the Supreme Court in Williams v. Taylor, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000).  This Court may not grant relief unless the state court's merits review of a claim alleging constitutional error "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).  For those claims that were properly presented to the state court but not adjudicated on their merits, this Court must conduct a de novo review of the questions of law and mixed questions of law and fact presented.  Weeks v. Angelone, 176 F.3d 249, 258 (4th Cir. 1999).

A state court decision is contrary to clearly established federal law if the court "arrives at a conclusion opposite that reached by [the Supreme] Court on a question of law or if the state court decides a case differently

than [the Supreme] Court has on a set of materially indistinguishable facts." Williams, 529 U.S. at 413, 120 S.Ct. 1495.  A state court decision is an unreasonable application of clearly established federal law if "the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."  Id.  A state court decision also may be an unreasonable application of clearly established federal law if it applies Supreme Court precedent "in a context different from the one in which the precedent was decided and one to which extension of the legal principle of the precedent is not reasonable [or] fails to apply the principle of a precedent in a context where such failure is unreasonable."  Robinson v. Polk, 438 F.3d 350, 355 (4th Cir. 2006) (citation omitted).

The Supreme Court has cautioned that an *unreasonable* application of federal law differs from an *incorrect* application of federal law.  See Williams, 529 U.S. at 410, 120 S.Ct. 1495.  Thus, "[u]nder 2254(d)(1)'s 'unreasonable application' clause, . . . a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be

unreasonable."  Id. at 411, 120 S.Ct. 1495.  In deciding whether a state

court's application of clearly established federal law is unreasonable within

the meaning of § 2254(d), a federal habeas court should ask whether the

state court's application of clearly established federal law was "objectively

unreasonable."  Id. at 409, 120 S.Ct. 1495.

Finally, the state court's factual findings are presumed to be correct,

and this presumption may be rebutted only by clear and convincing

evidence.  28 U.S.C. § 2254(e)(1).


## IV.    DISCUSSION

### A.    Claim I: Ineffective Assistance of Counsel

In his first claim, Petitioner alleges that he received ineffective

assistance of counsel in three critical respects.  First, Petitioner contends

that counsel failed to investigate and present significant mitigating evidence

regarding his background and childhood.  Second, Petitioner contends that

counsel's inadequate investigation led counsel to the decision to present

Dr. Horacek's multiple personality defense, even though counsel had lost

confidence in Dr. Horacek before trial and were skeptical of Dr. Horacek's

diagnosis and methods.  Had counsel conducted an adequate mitigation

investigation, Petitioner contends, they would have uncovered a wealth of evidence that, standing alone, was mitigating and that would have led to a more credible mental health defense, like that offered by Dr. Seymour Halleck, Petitioner's post-conviction mental health expert. Third, Petitioner asserts that counsel were ineffective for failing to offer available evidence that he was remorseful after fatally injuring his son. Petitioner claims that but for counsel's deficient investigation and presentation of his mitigation defense, there is a reasonable probability that the jury would have returned a life sentence.[5] [Doc. 10 at 16-30].

Petitioner raised his claim that counsel failed to investigate and present significant mitigating evidence regarding his background and

---

[5]In his Amended Petition, Petitioner also alleges that counsel were ineffective in failing to present evidence that he suffered from a life-long hearing impairment. [Doc. 10 at 17]. Respondent raised the defense of exhaustion with respect to this claim [Doc. 18 at 1-2], and Petitioner subsequently elected to abandon it [Doc. 27 at 2]. Accordingly, Petitioner's claim of ineffective assistance of counsel based upon counsel's failure to present evidence of Petitioner's hearing impairment is waived, and the Court will not further address it.

Additionally, in his original Petition for Writ of Habeas Corpus, Petitioner alleged that counsel were ineffective in failing to seek an instruction to the jury to "disregard the possibility of parole." [Doc. 1 at 8]. In its December 19, 2006 Order, this Court ordered Petitioner to file an amended habeas petition that complied with Rule 2 of the Rules Governing Section 2254 Cases in the United States District Courts or risk having his habeas claims adjudicated on the facts appearing on the face of his pleadings. [Doc. 9]. Petitioner's amended habeas petition does not allege the ineffective assistance of counsel for failure to seek such an instruction. [See Doc. 10 at 16-30]. Because Petitioner decided not to continue asserting this claim and because Petitioner has provided no factual basis for it, this claim is denied.

childhood in First Amended MAR Claim VII.  The MAR court denied this claim both on procedural grounds[6] and on the merits, finding that trial counsel had performed an adequate investigation of Petitioner's childhood and background and had presented adequate evidence in mitigation regarding Petitioner's childhood, but that the evidence of Petitioner's guilt and in support of the aggravating circumstances was "overwhelming."  The MAR court further found that "[a]ny error that trial counsel may have made did not prejudice Petitioner and there is no reasonable probability that, but for the error or errors, there would have been a different result in the proceedings."  [Pet'r Ex. 13 at 13].  This claim having been addressed on the merits by the state court, this Court's review is limited to whether the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law" or "was based on an unreasonable determination of the facts in light of the evidence."  28 U.S.C. § 2254(d).

---

[6]Specifically, this claim was denied pursuant to North Carolina's mandatory procedural bar statute, N.C. Gen. Stat. § 15A-1419, which bars a motion for appropriate relief when the petitioner was in an adequate position to raise the federal claims on direct appeal but failed to do so.  Because the Court concludes that the MAR court properly denied this claim on the merits, the Court need not address whether this claim was properly dismissed on procedural grounds as well.  See Fisher v. Lee, 215 F.3d 438, 452 (4th Cir. 2000).

Petitioner raised the second component of his ineffective assistance claim in his original MAR as part of a two-part ineffective assistance claim concerning his mental health defense. [Pet'r Ex. 5 at ¶¶35-49]. The first part of his MAR claim alleged ineffectiveness on the part of counsel for presenting a mental health expert in whom they had lost confidence and a mental health defense that they knew was not credible. [Id. at ¶¶35-45]. The second portion of the MAR claim alleged ineffective assistance of counsel for failing to seek a continuance to allow their mental health expert more time to complete his evaluation and his report before trial. [Id. at ¶¶46-47, 48, 49]. In denying the MAR claim, the MAR court addressed only the portion of the claim alleging ineffectiveness for failing to move to continue the trial to allow their expert more time to complete his report. [Pet'r Ex. 4 A at ¶ 2].

In an attempt to obtain reconsideration of the MAR court's actions with respect to both the unaddressed and addressed aspects of this claim, Petitioner again raised these issues as one global ineffective assistance claim in his Second Amended MAR. In support of his Second Amended MAR, Petitioner submitted the evidence and affidavits that he had intended to present at the evidentiary hearing. Additionally, Petitioner argued for the

first time that it was counsel's inadequate mitigation investigation that led them to rely upon Dr. Horacek and his multiple personality disorder diagnosis. The MAR court concluded that the ineffective assistance claim raised in the Second Amended MAR was procedurally barred from review because the issues had been raised previously in Petitioner's original MAR and First Amended MAR. Although the MAR court did not cite a specific procedural rule, it appears that the court relied upon N.C. Gen. Stat. § 15A-1419(a)(2) in denying Petitioner's Second Amended MAR. That provision requires an MAR court to deny review of a claim if the grounds or issue *was determined on the merits* upon a previous motion. In light of the MAR court's specific reference to the continuance claim and the absence of any acknowledgment of Petitioner's allegations regarding the multiple personality disorder defense and problems with the mental health expert, the Court concludes that the MAR court adjudicated only Petitioner's claim that counsel were ineffective for failing to seek and/or secure a continuance and failed to address Petitioner's claim that counsel's inadequate mitigation investigation led them to rely upon Dr. Horacek and his multiple personality disorder diagnosis. Because this particular claim was not addressed on the merits by the MAR Court, the Court shall review any questions of law

and any mixed questions of law and fact presented <u>de novo</u>.  <u>Fisher</u>, 215

F.3d at 445; <u>Weeks</u>, 176 F.3d at 258.

The third component of Petitioner's ineffective assistance claim,

regarding counsel's failure to present available evidence that Petitioner

was suicidal and remorseful, was raised by Petitioner in his original MAR.

This claim was denied by the MAR court on its merits.  Accordingly, the

Court's review of this claim is limited to whether the state court's decision

"was contrary to, or involved an unreasonable application of, clearly

established Federal law" or "was based on an unreasonable determination

of the facts in light of the evidence."  28 U.S.C. § 2254(d).

### 1.    The <u>Strickland</u> Standard

The Supreme Court has stated the test for determining whether a

defendant received adequate assistance of counsel as follows:

> First, the defendant must show that counsel's
> performance was deficient.  This requires showing
> that counsel made errors so serious that counsel was
> not functioning as the "counsel" guaranteed the
> defendant by the Sixth Amendment.  Second, the
> defendant must show that the deficient performance
> prejudiced the defense.  This requires showing that
> counsel's errors were so serious as to deprive the
> defendant of a fair trial, a trial whose result is reliable.

Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Unless a defendant makes both showings, his claim of ineffective assistance of counsel must fail. Thus, a defendant must show both that counsel's performance fell below objective standards of reasonableness, and that, but for this conduct, there was a reasonable probability that the result of the trial would have been different. Id. The same Strickland principles apply to claims of ineffective assistance of counsel at sentencing. See Williams, 529 U.S. at 390, 120 S. Ct. 1495.

In determining reasonableness under the performance prong, the Court must consider whether the performance was reasonable in light of the totality of the circumstances at the time the performance was rendered. Strickland, 466 U.S. at 690, 104 S. Ct. 2052; Rompilla v. Beard, 545 U.S. 374, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005) ("Ineffective assistance under Strickland is deficient performance by counsel resulting in prejudice, with performance being measured against an objective standard of reasonableness, under prevailing professional norms.") (citations and internal quotation marks omitted). Given this individualized inquiry into reasonableness, "specific guidelines are not appropriate," Strickland, 466 U.S. at 688, 104 S. Ct. 2052, because such rigid guidelines "would interfere

with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions," id. at 689, 104 S.Ct. 2052. The Strickland Court also admonished reviewing courts to avoid the temptation "to second-guess counsel's assistance" in hindsight, and that "[j]udicial scrutiny of counsel's performance must be highly deferential." Id. As to the reasonableness of an attorney's investigation, the Strickland Court offered the following guidance:

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

Id. at 690-91, 104 S. Ct. 2052.

Under Strickland, the defendant also must demonstrate that he was prejudiced by his counsel's deficient performance to such a degree "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694,

104 S. Ct. 2052.  "In order to show prejudice when a petitioner is challenging his death sentence, he must establish a probability that, absent counsel's errors, the sentencer -- including an appellate court, to the extent it independently reweighs the evidence – would have concluded that the balance of aggravating and mitigating circumstances did not warrant death."  Barnes v. Thompson, 58 F.3d 971, 979 n.11 (4th Cir. 1995) (quoting in part Strickland, 466 U.S. at 695, 104 S. Ct. 2052).  "A reasonable probability is a probability sufficient to undermine confidence in the outcome."  Strickland, 466 U.S. at 694, 104 S. Ct. 2052.  "In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury."  Id. at 695, 104 S. Ct. 2052.

A reviewing court need not determine whether counsel's performance was deficient before examining the prejudice allegedly suffered as a result of the alleged deficiencies of counsel, and if it is easier to dispose of an ineffective assistance of counsel claim on the ground of lack of sufficient prejudice, the reviewing court should analyze the claim under the prejudice prong only.  Id. at 697, 104 S. Ct. 2052.

## 2.    Evidence Presented to the Jury at Sentencing

The Court begins its review of Petitioner's ineffective assistance claim with a review of the mitigating evidence that Petitioner's trial counsel presented to the jury.

At the sentencing proceeding, Petitioner's attorneys presented evidence from Petitioner's childhood in the form of letters from his parents, pictures, and newspaper clippings reporting some childhood accomplishments, as well as Petitioner's induction into the Air Force. Redacted versions of two letters from Petitioner's parents were read into the record.  The letters expressed love and support for Petitioner, some information about serious childhood illnesses, and a list of his parents' own ailments and financial situation that purportedly prevented them from traveling to North Carolina for their son's trial.  [Resp't Ex. 21, Vol. VI at 2-139-146].

Petitioner's attorney also presented the testimony of Audrey Bryant, a social worker with Buncombe County Department of Social Services, who interviewed Petitioner in jail on March 17, 1993.  At that point, Lyle had not yet died, and Petitioner had been charged with felony child abuse.  Ms. Bryant testified that when she asked Petitioner how Lyle received his

bruises, he responded, "From me." She testified that she had to repeat her questions frequently because Petitioner's head was in his hands for much of the interview. When asked if he wanted Ms. Bryant to give a message to Colleen Shank, Petitioner replied, "Tell her I'm sorry." [Resp't Ex. 21, Vol. V at 2-130-132].

Petitioner's attorneys attempted to elicit from Ms. Bryant testimony to the effect that a deputy had told her that Petitioner had threatened to kill himself. The State objected on the grounds that such testimony would be hearsay, and the court sustained the State's objection. [Id. at 2-131].

The defense also presented the testimony of Jesse Carr, the owner of Minico Cleaners and Laundry, who testified that Petitioner had worked for him for a year and a half. He testified that Petitioner was always on time and that if Petitioner did not have transportation, he would walk from the homeless shelter where he lived at the time. He characterized Petitioner as a good worker. Carr testified that Petitioner left Minico for a higher paying job. [Id. at 2-134-135].

Additionally, Petitioner's attorneys presented the testimony of David Waites, an investigator for the public defender's office, who testified that Petitioner enlisted in the Air Force after he graduated from high school.

Petitioner's military records indicated that Petitioner was involved in three alcohol-related incidents that resulted in a recommendation for an honorable discharge less than a year after he had enlisted.  [Resp't Ex. 21, Vol. VI at 2-148-152].  Through Waites, Petitioner's attorneys introduced a video tape into evidence which showed that Petitioner had been a victim of an armed robbery at the convenience store where he worked and that Petitioner had attempted to apprehend the suspect.  [Id. at 2-155].

The defense also presented the testimony of psychiatrist Dr. Joseph Horacek.  Dr. Horacek testified that it was his opinion that Petitioner suffered from disassociative identity disorder, also known as multiple personality disorder.  [Resp't Ex. 21, Vol. V at 2-70].  He also strongly suspected that Petitioner had attention deficit hyperactivity disorder and unspecified learning disabilities.  [Id.].  He testified that there were a number of other mental illnesses and disorders that were still open for consideration in Petitioner's case but that he did not have enough information to either rule them out or to change the diagnosis.  [Id. at 2-70-71].  Among the diagnoses he could not rule out were: schizophrenia, malingering, manic depressive illness, and personality disorders, including anti-social and borderline personality disorders.  [Id.].

Dr. Horacek testified that multiple personality disorder typically arises as a result of prolonged and severe sexual and/or physical abuse.  [Resp't Ex. 21, Vol. V at 2-75].  He also testified that any prolonged trauma that would be painful as a child, including medical illness, can produce multiple personality disorder.  Dr. Horacek testified that he had learned from Petitioner, Petitioner's father and a friend of Petitioner's that Petitioner had been sexually abused as a child.  He also testified that Petitioner reported being sexually abused at least three times by an older brother named "Butch" and by a group of four neighborhood boys throughout his childhood and adolescence.  Dr. Horacek testified that Petitioner reported that the neighborhood boys also physically abused and humiliated him.  Dr. Horacek testified further that children who are victims of abuse often grow up to be abusers themselves.  [Id. at 2-82, 85-86, 88].

Dr. Horacek testified that while in the sixth grade, Petitioner contracted spinal meningitis, which caused residual deafness in one ear and could have accounted for some of the learning difficulties or attention deficit difficulties that Petitioner had.  Dr. Horacek testified that Petitioner also had had numerous head injuries, a chronic inner ear infection, a perforated eardrum, and chronic back pain.  Dr. Horacek also testified that

as Petitioner got older, he got into a lot of fights, during which he sustained injuries.  [Id. at 2-87-88].  In addition, he testified that Petitioner had once been involuntarily committed to a hospital in Pennsylvania because he had become violent and suicidal.  [Id. at 89].

Dr. Horacek testified that he began to suspect that Petitioner had multiple personality disorder upon reading statements by Colleen Shank and a friend mentioning "a demonic, evil spirit that they talked with named Chad . . . , and that this person Chad that came out of Randy Atkins claimed to be a spirit from hell."  Additionally, Petitioner had reported to doctors at Dorothea Dix Hospital that there were periods of time for which he had no recall.  [Resp't Ex. 21, Vol. V at 2-76].  Dr. Horacek further testified that while Petitioner initially denied having any alternate identities, he eventually acknowledged a personality named "Chad."  [Id. at 2-77].  Dr. Horacek claimed to have discovered another personality named "Brian." [Id.].[7]

Dr. Horacek testified that the most likely explanation for Petitioner killing his son was that one of his alternative personalities was in control.

---

[7]Petitioner claims that he made statements about alternate personalities only after being heavily drugged with sodium amytal by Dr. Horacek, but that this fact was not disclosed to the jury.  [Doc. 10 at 17].

[Resp't Ex. 21, Vol. V at 2-88-89]. It was Dr. Horacek's opinion that the crime was committed while Petitioner was under the influence of a mental or emotional disturbance and that Petitioner's ability to conform his conduct to the requirements of the law was impaired by his mental condition. It was also his opinion that Petitioner's ability to appreciate the criminality of his conduct was impaired. [Id. at 2-90-91].

Dr. Horacek expressed disagreement with the opinions of the forensic psychiatrist, Dr. Clabe Lynn, who performed a competency evaluation on Petitioner shortly after Petitioner was charged with Lyle's murder and concluded that Petitioner had a personality disorder not otherwise specified and an adjustment disorder with mixed disturbance of emotions and conduct. Dr. Horacek testified that he probably would have diagnosed Petitioner similarly had his access to information been as limited as Dr. Lynn's. Dr. Horacek testified, however, that he made his diagnosis based on a greater amount of time spent with Petitioner and his access to more background information. [Resp't Ex. 21, Vol V at 2-90].

As indicated previously, the jury rejected all of the potential mitigating circumstances presented by Petitioner except for two: (1) that "the Defendant qualifies as having a learning disability due to his IQ variations,"

and (2) that "the Defendant was diagnosed by Dr. Clabe Lynn in April of 1993 as having a personality disorder and adjustment disorder with a mixed disturbance of emotions and conduct." [Resp't Ex. 1 at 207 ¶16, 208 ¶24].

### 3. Evidence Petitioner Contends Should Have Been Presented

Next, the Court reviews the mitigating evidence that Petitioner contends his trial counsel should have presented to the jury. In his habeas petition, Petitioner contends that if trial counsel had conducted an adequate investigation of his background and childhood, the following evidence could have been presented to the jury.[8] First, Petitioner's half-brother, Lyle ("Butch") Atkins, Jr., could have told the jury of the matters attested to in his affidavit. According to this affidavit, Butch Atkins and his brother, Ron, suffered terrible abuse and neglect at the hands of Petitioner's parents, Lyle, Sr. and Doris Atkins, as well as Floyd Atkins, an adult half-brother.

---

[8]Although Petitioner was denied an opportunity to make an offer of proof of this evidence before the MAR court, the mitigation evidence that Petitioner's counsel supposedly would have discovered but for the alleged Brady violation is the same as the evidence that Petitioner contends counsel would have uncovered but for their alleged inadequate investigation. [Doc. 10 at 31]. Thus, as a result of the December 2005 hearing on Petitioner's Brady violation claim, the evidence that Petitioner would have introduced had he had a full and fair hearing in the state court on his ineffective assistance claims is in the record and before this Court. Although the MAR court considered the evidence only in the context of the alleged Brady violation, this Court is under no similar constraint when considering whether Petitioner has alleged facts, that if true, would entitle to him to relief on his ineffective assistance claims.

When Petitioner was born, Floyd was approximately seventeen years old,

Ron was approximately eight years old, and Butch was approximately

seven years old. At the time of Petitioner's birth, the family lived in a tiny,

two-bedroom home that had no indoor plumbing. They were very poor, but

life was tolerable for Ron and Butch. After Petitioner was born, however,

the family dynamic changed. Petitioner received all of his parents'

attention, and Doris and Floyd, at Doris's direction, were physically and

mentally abusive towards Ron and Butch. Doris would bring home

presents for Petitioner but not the other boys, and Ron and Butch were

forbidden to play with Petitioner's toys. [Pet'r Ex. 10 D12: Aff. of Lyle H.

Atkins at ¶¶ 1-5].

When Petitioner turned five, Doris decided that he was old enough to

have his own bed so, beginning in the summer of 1968, he was moved into

the house's second bedroom, which he shared with Floyd. Ron and Butch,

who previously had shared the room, were forced by Doris to sleep in an

abandoned outhouse on the Atkins property. During the time that Ron and

Butch were living in the outhouse, Floyd would lure them into the house by

promising to allow them to watch television. According to Butch, once they

were inside, Floyd would sexually abuse them. It was Butch's belief that

Petitioner was present during some of the abuse.  Also according to Butch, Petitioner was present during some of the beatings administered by Doris. [Aff. of Lyle H. Atkins at ¶¶ 6, 9].

This living arrangement continued until December 1968 when a school guidance counselor, Deane Passmore, received reports that Ron and Butch were coming to school dirty and with a foul odor that was disturbing the other children.  Passmore could have told the jury that upon visiting the Atkins home, he discovered that Ron and Butch had been living in the outhouse since the summer, that they were not allowed into the house to wash clothes or bathe, that they slept in their dirty clothes because the outhouse was unheated, and that they were forced to eat their meals on the porch.  Passmore immediately removed Ron and Butch from the home and turned them over to Social Services.  Passmore states in his affidavit that he was "deeply affected" by this experience and considers the plight of Ron and Butch "among the very worst that I have seen in my 35 years as a Guidance Counselor."  Passmore also could have told the jury, "We left Randy in that home."  [Pet'r Ex. 10 D8: Aff. of Deane Passmore at ¶¶ 3, 5-6, 10-11].

Petitioner contends that further investigation would have revealed that Doris Atkins was injured at work in November 1968 [Aff. of Lyle H. Atkins at ¶ 16], and that she became addicted to pain medication as a result of this injury [Pet'r Ex. 10 D9: Statement of Gloria Conklin at ¶ 3]. Petitioner further contends that Pennsylvania criminal court records would have documented Doris Atkins's arrest in November 1968 for forging multiple prescriptions for the drug "Obedrin-LA," a highly addictive methamphetamine.  [Pet'r Ex. 10 D10: Criminal Complaint].

Petitioner further contends that Pennsylvania family court records would have documented for the jury the permanent removal of Ron and Butch from the Atkins's childhood home due to extreme abuse and neglect. Records show that in February 1969, a Warren County, Pennsylvania Court held a custody hearing with respect to Ron and Butch.  Doris and Lyle Atkins did not appear for the hearing, and the Court granted custody to Ron and Butch's biological mother, who moved the boys to California.  In the custody order, the court concluded that "the treatment afforded to the boys exhibited a settled neglect, complete indifference bordering on hatred, and extreme cruelty by [Doris and Lyle Atkins, Sr.]."  [Pet'r Ex. 10 D6:

March 3, 1969 Opinion and Order of the Court of Common Pleas, 37th Judicial District, Pennsylvania].

Ann Blair, the former director of the Senior Center in Sheffield, Pennsylvania, could have told the jury of the matters attested to in her affidavit. Specifically, Blair states in her affidavit that, in about 1975, when Petitioner would have been about twelve years old, she witnessed Lyle Atkins, Sr. use Petitioner "as bait" to elicit sympathy and handouts from the elderly residents at the Senior Center. Based on her observations, Blair states that she believes Lyle Atkins, Sr. also used Petitioner to help con other vulnerable people and to shoplift from stores. [Pet'r Ex. 10 D20: Aff. of Anne Blair at ¶¶ 3-5].

Petitioner further contends that his childhood schoolmates, Darryl Kring, Brian Studer, and James Hahn, could have told the jury of the matters attested to in their affidavits. Specifically, they could have told the jury that Petitioner was a frequent target of physical and mental abuse by his classmates, and he was ostracized because of his family's poverty and odd behavior. They also could have told the jury that Petitioner frequently smelled because he and his family had no running water throughout his

childhood.  [Pet'r Exs. 10 D18: Aff. of James Robert Hahn, 10 D21: Aff. of Brian Scott Studer, 10 D22: Aff. of Darryl Lee Kring].[9]

Petitioner's shop teacher, Bob Carlson, also could have told the jury about his observations of the extraordinary cruelty and humiliation that Petitioner suffered at school.  Carlson states that Petitioner would run to his class on a regular basis in order to escape abuse from other schoolchildren, and that Carlson sometimes had to walk Petitioner to class "to make sure he was safe."  [Pet'r Ex. 10 D19: Aff. of Bob Carlson].

Petitioner further contends that a certified social worker such as Joan Podkul could have conducted an adequate sentencing investigation and presented the above-referenced information to trial counsel.  Additionally, if necessary, Podkul could have presented social history testimony to the jury, including aspects of Petitioner's personal history and family background attested to in her affidavits.  [Pet'r Exs. 6 V, 7 D10].

Petitioner argues that a psychiatric expert such as Dr. Seymour Halleck, a forensic psychiatrist who evaluated Petitioner in 2000, could have told the jury of the matters attested to in his affidavits.  Specifically,

_____

[9]Petitioner was not completely without friends, however.  Kring, Studer, and Hahn socialized with Petitioner and attempted to protect him from some of the abuse he faced.  [Id.].  Kring told investigators that Petitioner got into a lot of trouble as a teenager and that his hobbies were "breaking in, '[b]usting stuff up,' and drinking."  [Pet'r Ex. 10 D15:  Daryl Lee Kring Interview].

Dr. Halleck would have testified that he had diagnosed Petitioner with intermittent explosive disorder, personality disorder not otherwise specified, with antisocial, borderline and narcissistic traits, and a substance abuse disorder, characterized as "a tendency to absolutely get violent and go off the deep end when he drank."  [Pet'r Ex. 9: MAR Evidentiary Hr'g Tr. at 125].  As examples of Petitioner's impulsivity under the influence of alcohol, Halleck could have identified at least two incidents in the military where Petitioner destroyed military property while intoxicated, once knocking down a door and once knocking out a window.  [Id. at 143].

Dr. Halleck also could have told the jury that children who are abused or neglected tend to have personality disorders or depression later in life. He could have testified that Petitioner had a history of severe neglect and abuse as a child and a history of impulsive, sometimes antisocial and aggressive behavior from early childhood.  Dr. Halleck further could have told the jury that there was a significant relationship between Petitioner's social history and his mental state and behavior at the time of the offense. [Id. at 125-126].[10]

---

[10]In his petition, Petitioner argues that "authoritative sources," including a Department of Justice website and other publications, "could have been cited [to] drive this point home to the jury."  [Doc. 10 at 22].  Because these sources were not part of the state court record, however, and because there was no testimony presented which relied on these sources, this Court will not consider them.

### 4.    Analysis

In assessing a claim of prejudice due to counsel's failure to offer certain mitigating evidence at sentencing, the Court must re-weigh the aggravating evidence against all of the mitigating evidence adduced both at trial and in the post-conviction proceedings.  Wiggins v. Smith, 539 U.S. 510, 534, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003).  For the following reasons, the Court does not find that there is a reasonable probability that had the jury heard all of the aforementioned evidence in addition to the evidence that Petitioner presented at his sentencing proceeding, it would have returned a different sentence.  See Strickland, 466 U.S. at 694, 104 S.Ct. 2052.

First, all of the evidence of physical and sexual abuse directed at Ron and Butch occurred prior to 1969, ending when Petitioner was just five years old.  There was evidence Floyd Atkins moved out of the house in 1969, when he married Gloria Conklin, and there is no evidence that he subsequently moved back in with the family.  Gloria Conklin's marriage to Floyd, and presumably her interaction with the family, also ended in 1970. [Pet'r Ex. 10 D4: Floyd Atkins Interview].  Furthermore, all of the evidence that Doris was addicted to prescription medication ends in 1970 with her

conviction for her 1968 offense. There is virtually no information about Petitioner's home-life after the age of five, except that the family was very poor and had no indoor plumbing, that Petitioner suffered from some serious childhood illnesses, and that his father used Petitioner to shoplift at stores while he distracted the clerks.

Furthermore, there is no direct evidence that Petitioner was physically abused by anyone in his family. Evidence from Butch and Kathleen Whipple, Floyd's second ex-wife, indicated that Petitioner was treated better than the other children. Petitioner was given toys and books that the other boys did not receive. He joined the Cub Scouts and won the Pinewood Derby as an elementary school-aged child. Presumably, he would not have been able to do those things on his own. Furthermore, his father not only taught Petitioner to play the banjo, but also played at various civic events with him. [Pet'r Exs. 9: MAR Hr'g Tr. at 206; 10 D1: Kathleen Whipple Interview at 2 ¶ 2; 10 D12: Aff. of Randy Atkins at ¶ 5; Resp't Ex. 21, Vol. VI: Trial Tr. at 2-144, 2-146].

Additionally, the post-conviction evidence indicating that Petitioner was sexually abused as a child was the same evidence presented to the jury through Dr. Horacek's testimony. Dr. Halleck testified that Petitioner

told him that he was sexually abused by Butch during a Cub Scout

camping trip and several times afterward and that he was sexually abused

by a group of neighborhood boys.[11]  Petitioner had related the same story

to Dr. Horacek.  It was Dr. Halleck's opinion, however, that Petitioner

actually was sexually abused by Floyd Atkins, not Butch.  His opinion was

based upon the fact that Butch presumably was living in California at the

time[12] and was younger than the age Petitioner had cited for his abuser.

Furthermore, because Floyd had sexually abused Butch, Dr. Halleck found

it likely that Floyd would have sexually abused other children.  The only

evidence that Floyd had sexually abused Butch, however, came from Butch

himself; neither of Floyd's ex-wives, both of whom had young children

when married to Floyd, stated that Floyd had done anything of a sexual

---

[11]There was evidence discussed outside the presence of the jury that when he was in elementary school, Petitioner was sexually assaulted by an older man in the neighborhood.  Dr. Halleck also referred to this alleged incident during his testimony at the hearing.  Neither trial nor post-conviction counsel could verify that Petitioner had been assaulted because the man suffered from dementia at the time of trial and was unable to communicate.  Trial counsel chose not to have Dr. Horacek testify about the incident because it would have opened the door for the State to elicit evidence of Petitioner's criminal activity directed at the man.  [Resp't Ex. 21, Vol. V, at 2-83-84].  Petitioner has made no allegations of ineffectiveness with respect to counsel's decision not to have Dr. Horacek testify regarding this incident.

[12]It was revealed during cross-examination of Petitioner's mitigation specialist that, as a teenager, Butch made at least one trip from California to Pennsylvania to see his father.  [Pet'r Ex. 9: MAR hearing Tr. at 211, 213].  From the record, it does not appear that Dr. Halleck was aware of that fact.

nature to their children.  Dr. Halleck readily conceded that he could not

prove that Floyd had sexually abused Petitioner.  Indeed, Dr. Halleck

conceded that he could not prove that Petitioner had been sexually abused

by anyone.  Consequently, the only evidence that Dr. Halleck had to

corroborate his belief that Petitioner was sexually abused was Petitioner's

self-reports.  It is not reasonably probable that the jury, having rejected Dr.

Horack's evidence of sexual abuse, would have found the same evidence

any more mitigating had it been delivered by Dr. Halleck.

While acknowledging that Petitioner was not the primary object of the

neglect or abuse in the family, Dr. Halleck opined that Petitioner's

witnessing of the abuse, both physical and sexual, and neglect of his two

brothers would have horrified and terrified him.  [Pet'r Ex. 9: MAR Hr'g Tr.

at 130].  Dr. Halleck, however, did not provide any reasonable basis for

believing that such feelings would have continued after Ron, Butch, and

Floyd had left the home.  Further, Dr. Halleck did not provide any

explanation as to how these events could have affected Petitioner's state of

mind on the day he fatally injured his son.

Even if Dr. Halleck's diagnosis of a personality disorder could be

viewed as evidence in and of itself of severe abuse and neglect (i.e., that

Petitioner's personality disorder must have resulted from severe abuse and neglect), the sentencing jury already had before it a diagnosis of personality disorder by Dr. Lynn. Although Dr. Halleck did not diagnose Petitioner with anti-social personality disorder, he testified that Petitioner had some of the characteristics of that disorder. The fact that Dr. Halleck's diagnosis carried with it anti-social, borderline and narcissistic traits would not have increased the mitigating value of the diagnosis. The prosecution would have brought out on cross-examination, as it did during the evidentiary hearing, that a personality disorder is not necessarily a mental illness. Dr. Halleck testified that there is no recommended treatment for anti-social personality disorder and that in a criminal prosecution, the diagnosis generally is used to prove that the defendant was not acting under the influence of a mental illness. [Id. at 155].

Additionally, although he testified that it was his opinion that at the time of the murder Petitioner was acting under the influence of a mental or emotional disturbance and that Petitioner's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired, Dr. Halleck failed to provide any basis for that opinion. Dr. Horacek offered the same opinions and explained that those

opinions were based upon his conclusion that an alternate personality was in control when Petitioner fatally injured Lyle. The jury rejected the proffered mitigating factors that were based upon Dr. Horacek's opinions. Dr. Halleck, on the other hand, failed to explain the relevance of his diagnoses to Petitioner's conduct on the day that he fatally injured Lyle. He also failed to explain how Petitioner's alleged background of severe abuse and neglect rendered him incapable of appreciating the criminality of his conduct or how his background induced a mental or emotional disturbance on the day that Lyle was fatally injured. At best, he would have left the impression that Petitioner's mental state was impaired because he was abused as a child, which would have invited obvious, but not necessarily beneficial, comparisons to the level of abuse that Butch had suffered and to the relatively positive course that Butch's life ultimately had taken.

Additionally, there are at least three aggravating factors that, when considered together, outweigh Petitioner's mitigating evidence. The first factor is the vulnerability of the victim – an utterly helpless, completely dependent baby, whom nature and the law had charged Petitioner with protecting. The second factor is the aggravating circumstance found by the jury, namely that the murder was especially heinous, atrocious, or cruel.

See N.C. Gen. Stat. § 15A-2000(e)(9).  In finding this aggravating circumstance to exist, a unanimous jury agreed that this murder was not merely shockingly evil, but also outrageously wicked and vile, and designed to inflict the highest degree of pain with utter indifference to Lyle's suffering.  [Resp't Ex. 21, Vol. VI at 2-268].  The jury also unanimously agreed either that the brutality in this murder was so great that it exceeded the level of brutality which is normally present in any murder or that the murder was a consciousless, pitiless crime that was unnecessarily tortuous to Lyle.  [Id.].  The evidence in this case, which showed that Petitioner brutally beat his infant son to death, amply supports either finding.

The cause of death in this case was severe injury to Lyle's brain, causing brain death.  Colleen Shank testified that she saw Petitioner hit Lyle's head hard against the trailer wall several times.  Dr. John McLeod, a pathologist, performed an autopsy on Lyle.  He testified that he found large areas of recent hemorrhage between the skin and the bone of the skull and multiple areas of fractures of the skull on both the right and left side of the skull and multiple broken bones in the back of the head.  [Resp't Ex. 21, Vol. V at 2-39].  CT scans also revealed extensive fractures on the left and right sides of Lyle's skull, as well as bleeding around the brain and swelling

of the brain. Although there was testimony that Petitioner had told Shank and investigators that he accidently had dropped Lyle several weeks prior to Lyle's death, Dr. McLeod opined that the injuries to Lyle's brain were caused by severe trauma that had occurred within 24-48 hours prior to death. [Id. at 2-42]. Dr. David Merten, a pediatric radiologist who reviewed Lyle's x-rays and CT scans, testified that Lyle's skull fractures were inconsistent with a fall. [Id. at 2-26]. He testified that simple falls or being dropped in infancy do not produce the type of "eggshell" fractures that Lyle had. [Id. at 2-27]. He also testified that in previous studies of head injuries in infants and small children, there had never been a case where extensive brain injuries similar to Lyle's were incurred during an accidental fall or from having been dropped. [Id.].

Lyle's injuries did not end with those that caused his death, and it is the evidence of these other injuries that do the most damage to Dr. Halleck's opinions regarding Petitioner's mental state on the day that he fatally injured his son. Dr. Cindy Brown, the on-call pediatrician who examined Lyle in the Emergency Room, testified that she observed "multiple bruises of various ages and swollen areas along his extremities that . . . represent[ed] fractures in various stages [of healing]." [Resp't Ex.

21, Vol. IV at 623].  She testified further that Lyle's right hip was completely dislocated and that his left hip was "rotated outwardly, which is in an abnormal position."  [Id. at 628].  She testified that the abnormality of the position of his legs was obvious prior to examination.  [Id.].  Dr. Brown also testified that it would have required "someone very strong" to have damaged Lyle's pelvis and hip that severely.  [Id. at 630].  She opined that Lyle would have been unable to sit up or stand by himself due to the damage to his hip and pelvis.  [Id.].  Indeed, two of Petitioner's neighbors testified that Lyle was unable to sit up on his own.  [Resp't Ex. 21, Vol. III at 465, 472-73].  Dr. Brown opined further that Lyle suffered from "battered child syndrome," which she defined as a child who "presents with multiple purposely inflicted injuries that are of varying ages."  [Resp't Ex. 21, Vol. IV at 632].  She testified that Lyle, at eight months old, was the most severely battered child that she had ever seen.  [Id. at 631].

Dr. Tamara Ball, a pediatric resident who assisted in Lyle's care, completed a tabulation of Lyle's visible external injuries.  [Resp't Ex. 21, Vol. IV at 639].  She testified that when he was admitted, Lyle had bruises of various ages in multiple locations.  [Id. at 640].  She also testified that he had a dislocated left elbow and obvious fracture of the left elbow; obvious

fractures in both upper legs; and an obvious fracture in the lower right leg.
[Id.].  It was her opinion that Lyle's injuries were consistent with "battered child syndrome."  [Id. at 643].  Using a chart, she identified for the jury at least 22 visible bruises on Lyle's body, as well as multiple fractures.  [Id. at 646-49].

CT scans and x-rays taken during Lyle's time at the hospital confirmed Dr. Brown and Dr. Ball's observations of Lyle's injuries.  Dr. Lawrence Blinn, a radiologist who reviewed the x-ray films taken of Lyle, testified that Lyle's films revealed fractures of the bones around the chest and fractures to both hip bones.  [Id. at 655-56].  Dr. Merten, the pediatric radiologist, testified that Lyle's films revealed a healing fracture of Lyle's right collar bone, a healing fracture of the upper right arm bone and healing fractures of his left upper arm.  [Resp't Ex. 21, Vol. V at 2-13].  The films also revealed a dislocated left elbow and swelling of the soft tissue of the left arm.  [Id. at 2-14].  The films showed healing fractures of both upper leg bones close to each hip, indicating extensive injury to the thighs of both legs.  [Id. at 2- 14-15].  The films of Lyle's spine showed at least one compression fracture of the spine, and Dr. Merten opined that there probably were similar fractures farther down the spine.  [Id. at 2-17].  An x-

ray of Lyle's right arm showed both a healing fracture mid-way down the upper right arm bone and an acute fracture closer to the wrist that did not show evidence of healing. [Id. at 2-18]. An x-ray of the left arm showed what may have been a dislocated shoulder, multiple fractures of the arm, and a dislocated elbow, which Dr. Merten testified was an acute injury.[13] [Id. at 2-18, 2-19]. He testified that for Lyle's elbow to have become dislocated as it was, someone had to have grabbed Lyle by the upper arm with one hand and the lower arm with the other and twisted and pulled them. [Resp't Ex. 21, Vol. V at 2-24, 2-25]. Films of Lyle's legs showed fractures at the top and bottom of both thigh bones. [Id. at 2-21, 2-22]. Dr. Merten testified that the original fractures to the right leg were two to three weeks old but that at least one fracture site had been reinjured more recently. [Id. at 2-23, 2-24]. He opined that all of Lyle's injuries occurred either within a day of the film being taken or over a period of time up to approximately four weeks before the films. [Id. at 2-24]. Finally, Dr. Merten testified that in the 22 years that he had been a pediatric radiologist and in the nine years that he had practiced pediatrics before that, he had never

---

[13] Dr. Merten explained to the jury that an "acute injury" is one that has occurred within one to three days prior to the x-ray and an "acute fracture" is one that occurred within one to seven days prior to the x-ray. [Id. at 2-19].

seen a child with injuries to his or her bones as extensive as Lyle's.  [Id. at 2-27].

There was even more evidence of child abuse for the jury to consider.  Dr. Robert Wiggins, a pediatric ophthalmologist who examined Lyle, testified that retinal hemorrhage is a specific ophthalomological indicator that the patient is a battered child.  [Resp't Ex. 21, Vol. IV at 678]. Dr. Wiggins testified that he observed hemorrhages within Lyle's retinas and retinal folds and that the degree of hemorrhages suggested repeated and severe shaking.  [Id. at 680].  He also testified that retinal hemorrhages during the first few years of life appear almost exclusively in battered child syndrome children.  [Id.].  He testified that over the course of his career, he had seen only two other children with retinal hemorrhages as severe as Lyle's.  [Id. at 681].

With such evidence of repeated, severe abuse, the Court cannot conclude that the jury would have been convinced by Dr. Halleck's opinion that Petitioner was operating under a mental or emotional disturbance at the time that he fatally injured his child.  Furthermore, it was not likely that the jury would have been convinced by Dr. Hallek's opinion that Petitioner could not appreciate the criminality of his conduct at the time of the murder;

there was evidence that on a previous occasion when Lyle stopped breathing and suffered an arm injury after having been left alone with Petitioner, Petitioner refused to allow Shank to call 911, fearing that he would get into trouble.

The jury also had before it evidence that Lyle suffered a great deal before he died. Dr. Brown, the on-call pediatrician, opined that Lyle would not have immediately lost consciousness from the blows to his head but that the process would have been gradual and that he would have been "in terrible pain" because of his head injury and the injury to his left arm. [Resp't Ex. 21, Vol. IV at 631]. Indeed, Shank testified that when she took Lyle from Petitioner he was crying, indicating that he was conscious after the attack. It was Dr. Ball's opinion, based upon Lyle's neuro-responses in the Emergency Room, that Lyle could feel pain during the first several hours of his hospitalization. [Id. at 642-43]. Finally, Dr. McLeod, the pathologist, opined that Lyle's skull injuries would most likely have caused him great pain and suffering. [Resp't Ex. 21, Vol. V at 2- 43].

The third factor to consider in aggravation is the absence of remorse in this case. The jury rejected the three proffered mitigating circumstances that were based upon remorse or early acceptance of responsibility.

[Resp't Ex. 1 at 207-09 ¶¶17-19].  Petitioner claims that there was additional evidence of remorse that could have been presented to the jury had counsel rendered effective assistance.  This argument, however, is without merit.

As indicated previously, social worker Audrey Bryant testified that she visited Petitioner in jail after his arrest but prior to his son's death.  She described his demeanor and behavior, as well as his request that she tell Colleen Shank that he was "sorry."  The trial court, however, sustained the State's hearsay objection to Ms. Bryant testifying that a deputy had told her that Petitioner had threatened to kill himself.  [Resp't Ex. 21, Vol. V at 2-131].

Petitioner contends that he was prejudiced by counsel's failure to present non-hearsay testimony from correctional officers that he was suicidal.[14]  [Doc. 10 at 22].  This assertion, however, is wholly conclusory.  As Respondent points out, Petitioner has failed to identify a single

_____

[14]Petitioner also claims that counsel were ineffective for failing to make an offer of proof so that the trial court's hearsay ruling could be reviewed on direct appeal.  On direct appeal, however, the North Carolina Supreme Court assumed arguendo that the alleged error was properly preserved for appellate review and determined that Petitioner was not prejudiced by the trial court's hearsay ruling.  Atkins, 349 N.C. at 79-80, 505 S.E.2d at 108-109.  He, therefore, cannot show that he was prejudiced by counsel's failure to make an offer of proof at trial.  See Strickland, 466 U.S. at 694, 104 S.Ct. 2052.

corrections officer or sheriff's deputy who would have testified that Petitioner was suicidal after he was arrested for abusing his child. In short, Petitioner has not presented any evidence of remorse that was not already before the jury.

The evidence before the jury was that Petitioner was more interested in self-preservation than he was in accepting responsibility for his actions. He provided members of the emergency medical team explanations for some of Lyle's obvious injuries that trial testimony showed to be false. When asked by one medical technician for an explanation for a bruise on Lyle's arm, Petitioner stated that Lyle had been playing and had fallen backwards, catching his arm under him. [Resp't Ex. 21, Vol. III at 491]. The jury, however, was aware that Lyle was unable to sit up to play. Petitioner told another member of the medical team that Lyle's left arm was swollen from regularly sleeping on it. The jury was aware that the injuries to Lyle's left arm were inconsistent with Petitioner's explanation. Petitioner likewise gave Woodfin Police Detective David Crompton varying stories about what had happened to Lyle, first telling him that Lyle had stopped breathing because of a kerosene heater in the trailer and later stating that Lyle had hurt his arm by falling out of Petitioner's arms. [Id. at 443]. It was

not until after he was arrested for felony child abuse that Petitioner admitted deliberately hurting his son, and even then his explanation of hitting Lyle on the head with his hand was inconsistent with the medical evidence.

Perhaps the most damning evidence was Detective Crompton's testimony regarding Petitioner's reaction to the news that his son had died. Detective Crompton testified that Petitioner made no expressions of grief or remorse, but instead complained about the conditions in jail, stating, "You don't know how they're treating me here.  You don't know how bad it is in jail." [Id. at 452].

The vulnerability of the victim, the brutality of the crime coupled with the evidence of repeated severe abuse, the pain and suffering of the victim, and the absence of remorse combined to make the aggravating evidence overwhelming in this case.  It is not reasonably probable that when weighing that aggravating evidence against all of the mitigating evidence presented at the MAR evidentiary hearing and at trial, a jury would have concluded that the mitigating evidence outweighed the aggravating evidence.  Consequently, Petitioner cannot show that he was prejudiced by

counsel's alleged failure to conduct an adequate mitigation investigation. See <u>Strickland</u>, 466 U.S. at 694, 104 S.Ct. 2052.

Petitioner argues in the alternative that he is entitled to an evidentiary hearing in order to present additional evidence on his ineffective assistance claim. Respondent argues that Petitioner should be denied a hearing pursuant to 28 U.S.C. § 2254(e)(2) because he failed to develop the factual basis for this claim in the state courts. Upon reviewing the record of the MAR proceedings, the Court finds that Petitioner and post-conviction counsel clearly made a diligent attempt to develop the factual basis of his ineffectiveness claims in the state courts. See <u>Robinson</u>, 438 F.3d at 367. As such, a hearing on this issue is not necessarily prohibited under § 2254(e)(2). The fact that Petitioner is not barred from receiving an evidentiary hearing in this Court, however, does not mean that he is entitled to one. "[A] district court may grant an evidentiary hearing in a § 2254 case only where the petitioner has 'allege[d] additional facts, that, if true, would entitle him to relief' and has 'establish[ed] one of the six factors set forth in <u>Townsend v. Sain</u>, 372 U.S. 293, 312, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963).'"[15] <u>Robinson</u>, 438 F.3d at 368 (citing <u>Fullwood v. Lee</u>, 290

---

[15]The six <u>Townsend</u> factors are as follows:

F.3d 663, 681 (4th Cir. 2002)).  Having considered all of the evidence that

Petitioner would have presented below, and assuming the truth of all of

these facts, the Court nevertheless concludes that Petitioner has failed to

"allege additional facts, that, if true, would entitle him to relief."[16]

Accordingly, Petitioner's request for an evidentiary hearing on his

ineffective assistance claim is denied.

Having considered all of the evidence in favor of aggravation and

mitigation, the Court concludes that Petitioner is not entitled to relief on his

habeas ineffectiveness claims under either the deferential standard of

review required by AEDPA or under the de novo standard of review

required for claims unaddressed by the state court.  See Weeks, 176 F.3d

at 263.  Therefore, to the extent that the MAR court rejected Petitioner's

---

(1) the merits of the factual dispute were not resolved in the state hearing; (2) the state factual determination is not fairly supported by the record as a whole; (3) the fact-finding procedure employed by the state court was not adequate to afford a full and fair hearing; (4) there is a substantial allegation of newly discovered evidence; (5) the material facts were not adequately developed at the state-court hearing; or (6) for any reason it appears that the state trier of fact did not afford the habeas applicant a full and fair fact hearing.

Fullwood v. Lee, 290 F.3d 663, 681 n.7 (4th Cir. 2002) (internal quotation marks omitted).

[16]Because the Court concludes that Petitioner has failed to allege additional facts that would entitle him to relief, the Court need not determine whether Petitioner has satisfied any of the Townsend factors.  See Robinson, 438 F.3d at 368.

allegations of ineffectiveness on the merits, those holdings did not result in decisions that were contrary to or an unreasonable application of clearly established federal law.  See 28 U.S.C. § 2254(d).  To the extent that the MAR court failed to address Petitioner's claim that counsel conducted an inadequate mitigation investigation which in turn led them to rely upon Dr. Horacek and his multiple personality diagnosis, the Court concludes that this claim is without merit and must be denied.

### B.    Claim II: <u>Brady</u> Violation

In his second claim, Petitioner asserts that the State withheld a report summarizing four witness interviews in violation of <u>Brady v. Maryland</u>, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).  [Doc. 10 at 30-43].

During their pre-trial investigation, the prosecuting attorney and a detective from the Woodfin Police Department, David Crompton, traveled to Petitioner's hometown of Warren, Pennsylvania.  While there, they interviewed a number of people, including Petitioner's oldest brother, Floyd Atkins.  During his interview, Floyd Atkins identified his first ex-wife as "Gloria Bullock," his second ex-wife as "Cathy Whipple," who lived at "Apt #8 Alleghany Village," and his third ex-wife as "Wendy Whitaker."  [Pet'r Ex.

10 D4: Floyd Atkins Interview].  The report summarizing Floyd Atkins's interview was disclosed to the defense.

After his return to North Carolina, Detective Crompton received a fax from a Warren County Sheriff's Deputy, which included the summaries of four witness interviews taken after Crompton had left Pennsylvania.  The interviewees were Gloria Conklin and Kathleen Whipple, two of Floyd Atkins's ex-wives, and Luke Whipple and Billy Jo Burt, two of Floyd Atkins's former step-children.  [Pet'r Ex. 10 D1].

The report indicates that Kathleen Whipple, Luke Whipple, and Billy Jo Burt alleged in their interviews that while he was a teenager, Petitioner had sexually assaulted Kathleen Whipple's six-year-old child.  [Id. at 3].  The report also indicates that during her interview, Kathleen Whipple, who had been married to Floyd Atkins when Petitioner was a teenager, further stated, in pertinent part, as follows:

> Randy appeared to be a nice kid but had alot of family problems.  Two other brothers Butch and another brother ranaway [sic] from home when they were teenagers.  She believes that this was due to Floyds [sic] mother having Floyd beat them and then making them sleep in the outside tolite [sic].  To her knowledge the ATKINS, [sic] still don't have a indoor tolite [sic].  Mrs. ATKINS, [sic] would treat Randy better than the other children.

[Id.].  The report summarizing these witness interviews was not provided to the defense.[17]

In the MAR proceeding below, Petitioner asserted that the State's failure to disclose this document to the defense constituted a Brady violation.  After conducting an evidentiary hearing, the MAR court denied Petitioner's claim.  While the MAR court found that the report had not been disclosed to the defense, the judge concluded (1) that the report did not contain any exculpatory or mitigating facts regarding Petitioner's conduct; (2) that anything that might have been learned by further investigation of these witnesses regarding Petitioner's childhood and abuse that he suffered was already within Petitioner's knowledge; and (3) that Petitioner had not shown any prejudice resulting from the State's failure to disclose this information.  [Resp't Ex. 17].

In his habeas petition, Petitioner asserts that the report of these interview summaries contains exculpatory evidence that should have been disclosed to the defense.  Specifically, he contends that had defense

---

[17]In fact, it appears that the report may not have been provided to the state prosecutor, as the fax was found during post-conviction discovery of the Woodfin Police Department's files of the case and not in the District Attorney's file.  Although Detective Crompton testified at the MAR evidentiary hearing that he had turned everything over to the prosecutor, the prosecutor denied any knowledge of this document.  [Pet'r Ex. 9: MAR Hr'g Tr. at 41-42].

counsel known that two of Petitioner's brothers were beaten by another brother at the direction of their mother and had run away, counsel would have contacted these witnesses and conducted further investigation of the Atkins family. Had counsel conducted a further investigation of the family, Petitioner argues, they would have discovered that Petitioner's mother may have been addicted to methamphetamines and had a criminal conviction for writing a fraudulent prescription and that Petitioner's half-brothers, Ron and Butch (Lyle, Jr.), were removed from the home and placed in the custody of their biological mother in California due to abuse and neglect on the part of Petitioner's parents. Finally, Petitioner asserts that had counsel had all of the aforementioned information regarding the Atkins family, they would have taken it into consideration in formulating their defense strategy, and would have presented it to the jury as mitigating evidence. [Doc. 10 at 30-43].

In Brady v. Maryland, the United States Supreme Court held that the prosecution deprives a criminal defendant of due process when it suppresses evidence that is "favorable to an accused . . . where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. 83, 87, 83 S.Ct. 1194, 10

L.Ed.2d 215 (1963).  In order to prove a <u>Brady</u> violation, Petitioner must establish three elements: (1) the evidence must be favorable, "either because it is exculpatory, or because it is impeaching"; (2) "that evidence must have been suppressed by the State, either willfully or inadvertently"; and (3) the evidence must be material, <u>i.e.</u>, "prejudice must have ensued." <u>Strickler v. Greene</u>, 527 U.S. 263, 281-82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999).  In order to establish the "prejudice" component, Petitioner must show that "there was a reasonable probability" that the result of his sentencing proceeding would have been different if the evidence had been disclosed to the defense.  <u>See</u> <u>id.</u> at 281, 119 S.Ct. 1936.  In other words, the question is whether "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict."  <u>Kyles v. Whitley</u>, 514 U.S. 419, 435, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995).

Because the MAR court correctly identified the governing legal standard as that set forth in <u>Brady</u>, this Court's review is limited to whether that court's application of that legal standard was "objectively unreasonable."  <u>Williams</u>, 529 U.S. at 409, 120 S.Ct. 1495.  Because the issues of materiality and prejudice are mixed questions of law and fact,

however, the state court's ultimate conclusion – that the failure to disclose this report was not a Brady violation – is not entitled to a presumption of correctness under section 2254(d).  See Bowen v. Maynard, 799 F.2d 593, 610 (10th Cir. 1986).

With respect to the first prong of the Brady test, the MAR court found that the interview summaries were not Brady material because they did "not contain facts which exculpate or mitigate the actions of the defendant." [Resp't Ex. 17 at ¶ 2].  The MAR court did not err in this regard.  In the sentencing context of a capital case where the defendant has pled guilty to the underlying capital crime, exculpatory evidence can be presumed to be one of two things: either it undermines the defendant's eligibility for the death penalty, or it mitigates the defendant's actions in committing the capital crime.  None of the information contained in the interview summaries would have made Petitioner less eligible for the death penalty. See Tuilaepa v. California, 512 U.S. 967, 971-72, 114 S.Ct. 2630, 129 L.Ed.2d 750 (1994) (discussing the constitutionally required elements for eligibility under a state's death penalty formula).  Nor does any of the information mitigate Petitioner's actions in murdering his infant son.  See Lockett v. Ohio, 438 U.S. 586, 604, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978)

(plurality opinion) (defining mitigating evidence as "any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death").

Petitioner contends that Kathleen Whipple's statement is exculpatory in the sense that defense counsel could have used it as a starting point to conduct further investigation, which would have led to the discovery of additional mitigating evidence. This assertion, however, is purely speculative, and Petitioner's argument as to how this statement potentially would have benefitted him is simply too tenuous. "The Constitution, as interpreted in <u>Brady</u>, does not require the prosecution to divulge every possible shred of evidence that could conceivably benefit the defendant." <u>Smith v. Secretary of New Mexico Dep't of Corrections</u>, 50 F.3d 801, 823-24 (10th Cir. 1995); <u>see also</u> <u>Moore v. Illinois</u>, 408 U.S. 786, 795, 92 S.Ct. 2562, 33 L.Ed.2d 706 (1972) ("We know of no constitutional requirement that the prosecution make a complete and detailed accounting to the defense of all police investigatory work on a case."). Rather, due process requires only the disclosure of material exculpatory evidence which, "if suppressed, would deprive the defendant of a fair trial." <u>United States v.</u>

Bagley, 473 U.S. 667, 675, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985).

Kathleen Whipple's statement simply does not rise to that level.

Moreover, the information contained in Kathleen Whipple's statement regarding Petitioner's home life and the abuse that he purportedly witnessed is information well within Petitioner's own knowledge. "[W]here the exculpatory information is not only available to the defendant but also lies in a source where a reasonable defendant would have looked, a defendant is not entitled to the benefit of the Brady doctrine." Lovitt v. True, 403 F.3d 171, 184 (4th Cir. 2005) (quoting United States v. Wilson, 901 F.2d 378, 381 (4th Cir. 1990)). As the Sixth Circuit has observed:

> Critical to Brady is the rule that:
>
>> Brady obviously does not apply to information that is not wholly within the control of the prosecution. There is no Brady violation where a defendant knew or should have known the essential facts permitting him to take advantage of any exculpatory information, or where the evidence is available ... from another source, because in such cases there is really nothing for the government to disclose.
>
> Coe v. Bell, 161 F.3d 320, 344 (6th Cir. 1998) (internal citations and quotations omitted). This rule makes sense because if the defendant could have presented similar evidence to prove the same point that the allegedly-suppressed information would have been introduced to prove, but did not, it is not

> reasonably probable that government disclosure
> would have led to a different result.

Owens v. Guida, 549 F.3d 399, 415-16 (6th Cir. 2008). Because the allegedly exculpatory evidence that appeared in Whipple's statement was reasonably available to the defense through other sources, including Petitioner himself, Petitioner cannot meet the second prong of the Brady test. See Strickler, 527 U.S. at 282, 119 S.Ct. 1936. Consequently, the MAR court's rejection of this claim did not result in a decision that was an unreasonable application of clearly established federal law, and Petitioner' Brady claim therefore must be rejected. See 28 U.S.C. § 2254(d)(1).

Petitioner argues that he is at least entitled to an evidentiary hearing on this claim. [Doc. 10 at 52]. Petitioner, however, raised before the MAR court the same facts that form the basis for this argument. Because the Court concludes that the MAR court did not unreasonably apply clearly established federal law to these facts in denying Petitioner's claim, and because Petitioner has not alleged any additional facts that, if taken as true, would entitle him to relief, the Court denies Petitioner's request for an evidentiary hearing.

## C.    Colleen Shank (Claim III)

Petitioner claims that the State failed to disclose an agreement that it had reached with Colleen Shank for leniency in exchange for her testimony against him, in violation of Brady.  Petitioner claims further that prosecutors allowed false testimony to go uncorrected when they let stand Shank's testimony that she had not been promised anything by the State in exchange for her testimony.  [Doc. 10 at 43-46].

Petitioner raised the substance of this claim on direct appeal and in his MAR.  On direct appeal, the North Carolina Supreme Court rejected Petitioner's claim, ruling as follows:

> Defendant was clearly allowed to inquire into any potential bias of Ms. Shank based upon any arrangement between the witness and the prosecution.  The trial court properly sustained an objection to a question that required Ms. Shank to reach a legal conclusion.  The trial court specifically allowed inquiry into any potential arrangement, and Ms. Shank responded that no such arrangement existed.  It is entirely proper for a trial court, in the exercise of its discretion, to sustain an objection calling for the legal knowledge of a lay witness.  State v. Mason, 295 N.C. 584, 248 S.E.2d 241 (1978), cert. denied, 440 U.S. 984, 99 S.Ct. 1797, 60 L.Ed.2d 246 (1979); accord State v. Greene, 285 N.C. 482, 206 S.E.2d 229 (1974).  We hold that the trial court committed no error by refusing to allow the questions posed to Ms. Shank concerning her potential punishment.

State v. Atkins, 349 N.C. 62, 81, 505 S.E.2d 97, 109 (1998).  During the MAR proceedings, Judge Winner concluded "[w]ith respect to Paragraph 7(c) [that the prosecutor presented 'false light' testimony and failed to reveal the deal with its chief witness Colleen Shank] in this Court's November 30th order, after reading the material furnished by the Attorney General in the State's motion for summary denial, the Court concludes that the allegations contained in the Motion for Appropriate Relief are not supported and that the same should have been denied in the November 30th order."  [Resp't Ex. 7 at ¶ 3].

In Brady v. Maryland, the Supreme Court held that the suppression of material evidence justifies a new trial "irrespective of the good faith or bad faith of the prosecution."  373 U.S. at 87, 83 S.Ct. 1194.  "When the 'reliability of a given witness may well be determinative of guilt or innocence,' nondisclosure of evidence affecting credibility falls within this general rule."  Giglio v. United States, 405 U.S. 150, 154, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972) (quoting Napue v. Illinois, 360 U.S. 264, 269, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959)).  The Supreme Court has held further that under the due process clause of the Fourteenth Amendment, a state may not knowingly use false evidence to obtain a conviction.  See Mooney v.

Holohan, 294 U.S. 103, 112-13, 55 S.Ct. 340, 79 L.Ed. 791 (1935).  This

applies equally to situations where the state deliberately elicits false

testimony and where the state, although not soliciting false testimony,

allows it to go uncorrected.  See Napue, 360 U.S. at 269, 79 S.Ct. 1173.

Nor does the rule "cease to apply merely because the false testimony goes

only to the credibility of the witness," rather than directly to the guilt of the

defendant.  Id.  Due process does not, however, automatically require a

new trial "whenever a combing of the prosecutors' files after the trial has

disclosed evidence possibly useful to the defense but not likely to have

changed the verdict."  Giglio, 405 U.S. at 154, 92 S.Ct. 763 (internal

quotation marks and citation omitted).  Instead, a new trial is warranted

only if "the false testimony could . . . in any reasonable likelihood have

affected the judgment of the jury."  Napue, 360 U.S. at 271, 79 S.Ct. 1173.

Colleen Shank testified on behalf of the prosecution at Petitioner's

sentencing trial.  In her testimony, she detailed Petitioner's brutality

towards Lyle, describing what she saw Petitioner do to the baby on March

16, as well as previous incidents when Petitioner injured Lyle and would

not allow her to seek medical attention for his injuries.

At the time of Petitioner's sentencing, Shank was under indictment for

aiding and abetting the first degree murder of Lyle. She testified on direct examination that prior to her testimony, she met twice with prosecutors at their office and that during those sessions, her case was not discussed. [Resp't Ex. 21, Vol. IV at 550]. On cross-examination, Shank testified that the State had not made her any promises in exchange for her testimony. [Id. at 589].

In order to show that Shank lied during her testimony regarding her dealings with the State and that the State knowingly let that lie stand, Petitioner first must show that there was an agreement, implicit or explicit, between Shank and the State. See Strickler, 527 U.S. at 281-82, 119 S.Ct. 1936. Petitioner asserts that he has prima facie evidence that Shank and the State reached an "understanding" that in exchange for her testimony, Shank would receive leniency with respect either to the charge against her or her sentence. Petitioner argues that he is entitled to a hearing on this issue because he was denied one in the state courts. [Doc. 10 at 45-46].

As indicated previously, to be entitled to a hearing on federal habeas review, Petitioner must overcome certain hurdles. He must show that he diligently attempted to provide a factual basis for his claim in state court, see 28 U.S.C. § 2254(e)(2); that he meets one or more of the Townsend

factors, discussed supra; and that he has "allege[d] additional facts, that, if true, would entitle him to relief," Robinson, 438 F.3d at 368. For the reasons that follow, the Court concludes that the majority of the facts upon which Petitioner relies do not entitle him to relief, and the rest of his factual allegations are simply not supported by his own evidence. Accordingly, Petitioner is not entitled to an evidentiary hearing on this issue, and his claim must be summarily dismissed.

In support of his claim, Petitioner alleges that Shank's attorney, Clarke Wittstruck, held plea negotiations with the District Attorney on August 30, 1993 and discussed them with Shank on September 1, 1993.[18] He also alleges that on November 10, 1993, Shank was interviewed by the District Attorney as a potential witness in Petitioner's murder trial and that on November 25, 1993, Wittstruck and Shank met with the prosecutor to prepare for Shank's testimony at Petitioner's sentencing trial. Finally, he alleges that, at the request of the District Attorney, Wittstruck was present for Shank's testimony at the sentencing trial. While all of these allegations are supported by the evidence, [Pet'r Ex. 5 L: Wittstruck Statement of

---

[18]Wittstruck also conducted plea negotiations with the District Attorney on Jan. 24, 1994 and on Oct. 14, 1994. Petitioner does not argue that those negotiations are evidence of a quid pro quo arrangement between Shank and the State.

Account, Aug. 30, 1993; Sept. 1, 1993; Nov. 10, 1993; Nov. 25, 1993; Dec. 2, 1993], none of these facts, considered alone or together, show the existence of an agreement between Shank and the State prior to her testimony in Petitioner's case.

Petitioner first argues that the fact Wittstruck and Shank conducted plea negotiations with the District Attorney prior to Petitioner's sentencing indicates that the parties formulated an agreement for Shank to testify against Petitioner in exchange for leniency. This is pure conjecture. The evidence does not support Petitioner's allegation. Wittstruck's entries accounting for the time he spent working on Shank's case reflect that on August 30, 1993, the two sides discussed trial scheduling, possible pleas and whether Petitioner and Shank would be tried jointly. Wittstruck called to update Shank two days later, and his time entry does not reflect that *any* understanding or agreement was reached with the D.A. except that Shank would not face trial before November 1993. [Pet'r Ex. 5 L: Wittstruck Statement of Account, Aug. 30, 1993, Sept. 1, 1993].

Next, Petitioner argues that the fact that Wittstruck and Shank met with the prosecutor on November 10 and November 25, 1993 to prepare for Shank's testimony at Petitioner's sentencing trial indicates that Shank

had struck an agreement with the State to testify against Petitioner in exchange for a more lenient sentence.  Once again, Petitioner's argument is based entirely upon conjecture.  It is to be expected that a prosecutor would interview an eyewitness and prepare that witness prior to her testimony in a first-degree murder case.  Furthermore, there is nothing in Wittstruck's entries for November 10 and November 25, 1993 that contradicts Shank's testimony that her case was not discussed during the sessions with the District Attorney [Resp't Ex. 21, Vol. IV at 550].  Although Wittstruck refers to negotiations and discussions of possible pleas with the District Attorney in numerous places in his time sheets [see Pet'r Ex. 5 L: Statement of Account, Aug. 30, 1993, Sept. 1, 1993, Jan. 24, 1994, May 4, 1994, Sept. 28, 1994, Oct. 14, 1994], Wittstruck's entries for November 10 and November 25, 1993 contain no such references or any indication that "an understanding" was reached with the District Attorney [Id. at Nov. 10, 1993, Nov. 25, 1993], and Petitioner posits no explanation for why Wittstruck would have left out such information.

Further, Petitioner contends that Wittstruck's presence during Shank's testimony at his sentencing trial indicates that Shank had agreed to testify against Petitioner in exchange for leniency.  This argument also

must be rejected.  It is not unusual for an attorney to be present during his client's testimony at another defendant's trial, especially when the client is facing trial on murder charges herself.  By observing her testimony, Wittstruck could ensure that his client would not be at risk of perjuring herself later at her own trial.  Furthermore, having counsel present would likely make the witness feel more comfortable testifying.  Indeed, the record indicates that the District Attorney may have wanted Wittstruck to be present for this very reason.  [Resp't Ex. 21, Vol. IV at 548-49].

Petitioner points to Wittstruck's time entry for the day Shank testified as constituting clear evidence that Shank testified in exchange for a plea deal.  Wittstruck's time entry for December 2, 1993 states: "Trial: present (pursuant to [District Attorney]) for testimony of client during sentencing hearing for murder plea."  [Pet'r Ex. 5 L: Statement of Account, Dec. 2, 1993].  Petitioner argues that this entry indicates that Wittstruck attended the hearing for the purpose of observing his client provide testimony *in exchange* for a "murder plea."  This, however, is simply not a reasonable interpretation of this entry.  Wittstruck and Shank were preparing for trial on her aiding and abetting charge until the State made its only plea offer – that she plead to manslaughter – on October 14, 1994.  All of the evidence

shows that Wittstruck did not intend for Shank to enter a plea to murder.

Petitioner was the only one to plead to a murder charge in this case, so the

only logical interpretation of this time entry is that Wittstruck was present to

hear the testimony of his client at the sentencing hearing subsequent to

*Petitioner's* murder plea, not Shank's.[19]

Petitioner also asserts that his argument is supported by the fact that

Wittstruck believed that an understanding had been reached with the

District Attorney that Shank would testify against Petitioner in exchange for

leniency.  Petitioner does not provide an affidavit from Wittstruck attesting

to such a belief.  Instead, he relies on the April 17, 2000 affidavit of

Stephen Lindsay, one of the attorneys from his first state post-conviction

counsel team.  [Pet'r Ex. 5 L: Lindsay Affidavit].  According to this Affidavit,

Wittstruck "indicated" to Lindsay on October 6, 1999 that

> it was his belief, based upon [meetings between
> himself, Ms. Shank and prosecutors] that [an] . . .
> understanding [was] reached . . . that Ms. Shank
> would be available to testify at [Petitioner's] trial and
> in exchange she would receive some reduction in
> either charges or sentence.   Mr. Wittstruck was

---

[19]Moreover, there is nothing in Wittstruck's prior or subsequent time entries to reflect that Shank reached any sort of agreement or understanding with the State to the effect that Shank would testify in exchange for a plea of any kind.  For example, Wittstruck's time entry for the previous day merely states that, at the request of the District Attorney, he was present for his client's testimony at Petitioner's trial.  [Pet'r Ex. 5 L: Statement of Account, Dec. 1, 1993].

> uncertain as to whether anything formal had been agreed upon and suggested that I obtain a copy of his time sheets submitted to the court for payment of his fees.

[Lindsay Affidavit at ¶ 4]. At most, Lindsay's Affidavit establishes that Wittstruck said (some six years later) that he *believed* an understanding was reached prior to Shank's testimony. Lindsay's recounting of Wittstruck's subjective beliefs, however, is hearsay and therefore inadmissible. Moreover, the documents to which Wittstruck suggested Lindsay refer for verification show something very different from Wittstuck's supposedly stated belief.

Even if the Court were to consider Lindsay's hearsay statements, their probative value is severely undermined by the fact that they bear almost no resemblance to the contemporaneous interview notes Lindsay made of his conversation with Wittstruck. [Pet'r Ex. 5 K: Notes]. These interview notes state, in pertinent part, as follows:

> I asked CW [Clarke Wittstruck] about whether there was a deal. He said he believed there was. His notion was to clear it as quickly as he could. He didn't want to be at defense table with Petitioner. . . .
> * * *
> As for the deal, he says he doesn't recall the timing but believes he got a plea to felony child abuse and that colleen [sic] made less than a year. He said he filed a detailed time sheet with his request for

payment and that this would reveal what he did when

. . . .

[Pet'r Ex. 5 K: Notes at ¶¶ 2, 4].[20]  These interview notes do not support the version of this conversation as related by Lindsay in his Affidavit.  The notes make no mention of meetings between Wittstruck, his client, and prosecutors prior to or during Petitioner's sentencing.  The notes do not make any reference to an exchange of testimony, a promise of a reduction of charges or leniency in sentencing, as suggested by Lindsay's Affidavit. While Lindsay's Affidavit states that Wittstruck believed that an "understanding" was reached involving testimony in exchange for future favorable treatment, Lindsay's contemporaneous interview notes indicate that Wittstruck referred to a "deal," not to an "understanding."  There is nothing in the notes that implies that the "deal" Wittstruck was referring to was anything other than the actual plea deal that he negotiated for Shank in October 1994.  As such, the contemporaneous notes of the interview with Wittstruck simply do not support the assertions made in Lindsay's Affidavit.

---

[20]While Wittstruck apparently believed that Shank pled to felony child abuse, the record indicates that Shank in fact pled guilty to involuntary manslaughter.  [Pet'r Ex. 5 L: Statement of Account Oct. 18, 1994].  The Court further takes judicial notice that North Carolina Department of Corrections records indicate that Shank was released from prison on April 14, 1997.

Furthermore, if there had been either an "understanding" or a "deal" that Shank would testify against Petitioner in exchange for future leniency, then Wittstruck would have known that Shank lied at the sentencing hearing and that the prosecutor let that false testimony stand. There is nothing in the interview notes, however, that reflects either of those facts.

Finally, Petitioner's own evidence indicates that no "understanding" was reached between the State and Shank prior to her testifying against Petitioner. According to Curtiss Graham, one of Petitioner's trial counsel, it was the practice of the District Attorney at the time of Petitioner's sentencing not to make any offers with cooperating co-defendants prior to their testimony, so as to insulate the witness from impeachment on that ground. [Pet'r Ex. 5 A: Statement of Curtiss Graham at ¶ 25].[21]

The most compelling evidence that Shank did not testify in exchange

---

[21]The statement attributed to Curtiss Graham is both unsigned and unsworn. It is not clear whether the MAR court considered this statement when adjudicating Petitioner's claim, as the MAR court summarily rejected this claim on the merits. This Court will consider it to the extent that it is not shown by other evidence to be inaccurate. Thus, because Graham's statement regarding the District Attorney's practice appears uncontradicted, the Court will accept this statement as true. Other assertions in Graham's statement, however, are contradicted by competent evidence in the record and will therefore be disregarded. For example, Graham asserts that Wittstruck and Shank's meetings with prosecutors prior to her testimony were characterized on Wittsruck's time sheets as "plea discussions." [Graham Statement at ¶ 26.] A review of Wittstruck's time sheets reveals, however, these meetings were not characterized as such. [Pet'r Ex. 5 L: Statement of Account, Nov. 10, 1993, Nov. 25, 1993].

for a promise of leniency is that nine months after she testified against Petitioner, she and Wittstruck were still preparing for trial in her own case. [Pet'r Ex. 5 L: Statement of Account, Sept. 14, 1994]. Wittstruck's time sheets indicate that he and the prosecutor conducted "negotiations" in January 1994 [Id. at Jan. 24, 1994], but that the next time they met, the two discussed trial options [Id. at Sept. 1, 1994]. Shortly thereafter, a trial date was set [Id. at Sept. 9, 1994], and it was not until October 14, 1994 that the prosecutor made a "plea offer" [Id. at Oct. 14, 1994]. That is the only reference to a plea offer anywhere in Wittstruck's time sheets. The fact that a trial date was not set for Shank until well after Petitioner asserts the supposed "understanding" was reached is compelling evidence that there was no "understanding" between the two prior to her testifying against Petitioner.

It is possible, even probable, that Shank *hoped* that by testifying against Petitioner she would receive favorable treatment with respect to her case. Wittstruck may have advised her that it was in her best interest to cooperate with the State. Hopes of leniency and the reasonable advice of counsel, however, are not evidence that a deal was struck or that an understanding was reached for leniency in exchange for testimony.

While the Court "do[es] not require *direct* factual support for each allegation a petitioner wishes to prove at a hearing[,] . . . the petitioner must rely on more than merely plausible inferences that there is a factual basis for his claim for relief."  See Jones v. Polk, 401 F.3d 257, 269 n.6 (4th Cir. 2005).  For the reasons detailed above, the Court concludes that Petitioner has failed to provide sufficient factual support for his allegation that Shank had an undisclosed agreement for leniency.  Accordingly, Petitioner's request for an evidentiary hearing is denied.

Even if Petitioner had presented sufficient factual support for his allegations that such an agreement had been reached and that Shank testified falsely about such an agreement with the District Attorney's knowledge, Petitioner would still not be entitled to relief on this ground as he has presented nothing to the Court to show that there was a reasonable likelihood that Shank's denial of an agreement with the State affected the judgment of the jury.  See Napue, 360 U.S. at 271, 79 S.Ct. 1173.  Indeed, there was overwhelming evidence presented to the sentencing jury, separate and apart from Shank's testimony, of Petitioner's brutality towards Lyle.  Petitioner admitted not only to injuring Lyle on March 16, 1993, but also to injuring the child on previous occasions and to not allowing Shank

to seek medical attention for Lyle because Petitioner was scared of the consequences. Furthermore, there was voluminous medical evidence that both catalogued the age and severity of Lyle's multiple injuries and indicated to the jury that Petitioner's various versions of what had happened to the child were not truthful.[22] While Shank was able to tell the jury what happened to Lyle on March 16, it was the medical testimony and photographic exhibits that truly told the story of Lyle's short, tortured life.

Additionally, the jury already had abundant evidence before it which called into question Shank's credibility. Shank was impeached on a number of issues and made several inconsistent statements during her cross-examination. Despite Shank's emotional testimony, the jury was likely to have been skeptical of a woman who, notwithstanding her obvious intellectual deficits,[23] had done nothing to protect her child. Furthermore, the jurors knew that she had been charged with aiding and abetting first degree murder, that she had met twice with prosecutors prior to her testimony, that she was represented by counsel when she did so, and that

---

[22]The Court notes that the medical and photographic evidence were consistent with Shank's testimony. For example, Shank testified that Petitioner held Lyle under the arms when hitting Lyle's head against the wall. The jury was shown photographs of finger-shaped bruises on Lyle's shoulder blades. [Resp't Ex. 21, Vol. V at 2-35].

[23]There is evidence in the record that Shank was of low intelligence or borderline mentally retarded. [Resp't Ex. 21, Vol V: at 2-107-108]**.**

she had discussed with her counsel whether to testify. [Resp't Ex. 21, Vol. IV at 549-50]. In spite of her assertions that she had not discussed her own case with the prosecutors and that she had not been promised anything in exchange for her testimony, jurors were free to draw their own conclusions about her motivations for testifying, particularly in light of the charge that she faced. The jury also was able to assess her credibility in light of the differences in the two statements that she gave to police. The first, given prior to Lyle's death, made no mention of Petitioner hurting Lyle on March 16, 1993. [Resp't Ex. 21, Vol. IV at 564-66]. The second, given after Lyle's death, detailed what she saw Petitioner do to the child on that day. [Id. at 568-70]. Furthermore, her credibility would not have been helped by her revelation that she believed that the mobile home in which she lived with Petitioner and Lyle was inhabited by a ghost and that she believed that Petitioner was possessed by a demon named Chad. [Id. at 580].

For these reasons, the Court concludes that the MAR court's dismissal of this claim did not result in a decision that was contrary to or an unreasonable application of clearly established federal law. See 28 U.S.C. § 2254(d)(1). Accordingly, the Court concludes that Petitioner is not

entitled to an evidentiary hearing on this issue, and this claim should be summarily dismissed.

### D. Shackling (Claim IV)

Petitioner claims that he was denied due process under the United States Constitution when he was shackled at the ankles during his sentencing proceeding. [Doc. 10 at 47-48].

Prior to jury selection for Petitioner's sentencing trial, the Buncombe County Sheriff approached the trial judge about an incident at the county jail that indicated that Petitioner might pose a security risk. [Resp't Ex. 21, Vol. I at 1-2]. The judge ordered a hearing on the issue of whether Petitioner should be placed in leg shackles. [Id.]. The evidence, as stipulated by the defense, was that someone, in an effort to force the cell door off its track, had placed a sheet or some other piece of cloth in the door track of the cell in which Petitioner and another inmate were housed. [Id. at 6-7]. Through his attorneys, Petitioner denied any involvement in the incident, and the State acknowledged that it could not prove which of the two men had tampered with the door. [Id. at 7]. Nevertheless, the State argued that in light of the incident and the fact that Petitioner faced a minimum sentence of life in prison, Petitioner constituted an escape risk.

[Id.].  The court ordered that Petitioner be placed in leg restraints while in

the courtroom, that the table skirts at counsel's tables remain in place to

shield the leg restraints from the jury, and that Petitioner be brought into

the courtroom and leave the courtroom outside the presence of the jury.

[Id. at 8].  The court based its ruling on the evidence regarding the cell

door, as well as previous voir dire evidence regarding Petitioner's

propensity for violence, the nature of the charge against Petitioner, and his

guilty plea to that charge.  [Id.].

Petitioner raised the substance of this claim on direct appeal.  The

North Carolina Supreme Court denied the claim on the merits, stating as

follows:

> Our review of the record reveals the trial court
> followed the procedure mandated by N.C.G.S. § 15A-
> 1031.  The trial court conducted a hearing pursuant to
> the statute, following a report of defendant's possible
> escape attempt from his jail cell.  Additional evidence
> indicated, and the trial court noted, that defendant had
> a propensity towards violence, as illustrated by his
> guilty plea to the brutal beating of his infant son and
> expert testimony at defendant's prior competency
> hearing reflecting a violent disposition.
>
> The ultimate decision concerning the restraint of a
> defendant rests within the trial court's discretion.
> State v. Tolley, 290 N.C. 349, 226 S.E.2d 353 (1976).
> The trial court is in the best position to balance the
> conflicting interests between defendant's right to a

proceeding free of prejudice and the State's need to maintain control over and prevent disruption of the court proceedings. The trial court's discretion is not unbridled and must be exercised in a manner that is "not exercised arbitrarily or wilfully, but with regard to what is right and equitable under the circumstances and the law, and directed by reason and conscience of the judge to a just result." Langnes v. Green, 282 U.S. 531, 541, 51 S.Ct. 243, 247, 75 L.Ed. 520, 526 (1931). The circumstances appropriate for the trial court's consideration include, inter alia: defendant's temperament and character, his age and physical attributes, his past record, his past escapes or attempted escapes, evidence of a present plan to escape, and threats to harm others or to cause a disturbance. See State v. Tolley, 290 N.C. at 368, 226 S.E.2d at 368.

The trial court in the instant case found evidence of numerous factors supporting the physical restraint of defendant. A hearing was conducted to allow argument by all parties concerning the need for restraint. All discussions concerning the need for physical restraint took place outside of the presence of the jury. The trial court ensured that a cloth was draped over defendant's counsel table to completely conceal the leg restraints from view by the jurors, thus limiting any potential prejudice to defendant. Defendant always entered the courtroom before the jurors and left the courtroom after the jurors so they would not view his leg irons. It is abundantly clear from the record that the trial court did not abuse its discretion in ordering defendant to wear restraints during the proceeding. Rather, it is apparent that the trial court took every conceivable precaution to evaluate the need for restraints and to minimize any potential prejudice to defendant. Accordingly, defendant's twelfth assignment of error is overruled.

State v. Atkins, 349 N.C. 62, 91-92, 505 S.E.2d 97, 115-16 (1998).

The North Carolina Supreme Court's denial of Petitioner's claim on the merits was correct and reasonable. In 1998, when the North Carolina Supreme Court adjudicated Petitioner's claim, there was no clearly established federal law prohibiting the use of restraints at sentencing proceedings. In fact, the Supreme Court did not address the issue until 2005. See Deck v. Missouri, 544 U.S. 622, 630, 125 S.Ct. 2007, 161 L.Ed.2d 953 (2005). In Deck, the Supreme Court held that due process concerns prohibit the use of *visible* shackles during either the guilt or the penalty phase of a trial unless the trial court determines that their use is justified by a state interest specific to a particular trial or defendant. Id. at 629, 125 S.Ct. 2007.

In the present case, the trial court determined that Petitioner posed both an escape risk and a safety risk. [Resp't Ex. 21, Vol. I at 8]. This finding of fact is presumed to be correct. 28 U.S.C. § 2254(e)(1). In any event, Petitioner has produced no evidence to show that the shackles were visible to the jury at any time or that anyone on the jury was aware that Petitioner was shackled. Indeed, the evidence is to the contrary. There was a table skirt around the defense table, which shielded Petitioner's legs

from view,[24] and the jury was not present when Petitioner either entered or left the courtroom.  [Resp't Ex. 21, Vol. I at 8].

Nevertheless, Petitioner argues a due process violation on the grounds that his inability to walk substantially impaired his ability to participate in his defense.  He argues that he was unable to move to a better vantage point for hearing witnesses and for viewing their presentations to the jurors.  [Doc. 10 at 47-48].  There is no evidence, however, that Petitioner ever indicated to his lawyers or to the court that he was unable to hear testimony or to see evidence.  Nor is there evidence that had Petitioner or his attorneys requested that he be allowed to move to better observe a witness's presentation of evidence, the trial court would have refused to make some accommodation so that Petitioner was better able to hear or view the evidence.  Further, while Petitioner argues that the jury perceived him negatively because he remained immobile at counsel's table [id.], he offers only speculation in support of his claim.

For the reasons articulated above, the Court concludes that the North Carolina Supreme Court's rejection of this claim did not result in a decision that was either contrary to or an unreasonable application of clearly

---

[24]The Court notes that there also was a skirt around the prosecutors' table. [Resp't Ex. 21, Vol. I at 2: 21-22].

established federal law.  <u>See</u> 28 U.S.C. § 2254(d)(1).  Accordingly, Petitioner's Claim IV is denied.

### E.  Ineffective Assistance of Counsel Regarding Hearing Impairment (Claim V)

In Claim V, Petitioner claims that trial counsel were ineffective for failing to investigate the extent of his hearing loss and for failing to request that the trial court take measures to accommodate his hearing impairment at his plea, competency and sentencing proceedings.  As a result, Petitioner argues, he was deprived of his rights under the Confrontation Clause to be fully present at trial, to participate in his defense, and to confront and cross-examine the witnesses against him.  [Doc. 10 at 48-52].

Petitioner raised this claim by way of an MAR in the state appellate division, <u>see</u> N.C. Gen. Stat. § 15A-1418, during the pendency of his direct appeal.  [Resp't Ex. 2 at ¶ 14.]  The North Carolina Supreme Court remanded the MAR to the Superior Court of Buncombe County.  [Resp't Ex. 2].  The Superior Court held a three-day hearing, at which ten witnesses testified and more than 50 exhibits were entered into the record. Subsequently, the court entered an order, containing 66 findings of fact, denying the MAR.  [Resp't Ex. 1 at 270-80].  Petitioner appealed, and the North Carolina Supreme Court affirmed, ruling as follows:

The evidence and testimony presented at the hearing on defendant's motion for appropriate relief amply support the trial court's decision denying the motion. All parties present at the motion hearing agreed that the acoustics inside the Buncombe County courthouse were less than ideal. However, the acoustics and audiometer measurements of the courthouse were not the real issue concerning the court at the motion hearing. The real issue concerned defendant's actual ability to hear, understand and participate in the capital proceedings.

Both the State and defendant proffered evidence evaluating defendant's hearing abilities. Again, all parties agree that defendant suffered some degree of hearing impairment. There was, however, a marked difference of opinion between the parties concerning defendant's ability to hear and understand the proceedings. William Auman, defendant's trial counsel, testified at the hearing that defendant consistently "respond[ed] or react[ed] in a way throughout the trial that led you to believe that he could hear what was going on during his trial." Mr. Auman's co-counsel, Curtiss Graham, likewise testified that throughout the competency hearing and sentencing proceeding defendant never indicated that he could "not hear the witnesses against him or the instructions of the Court or anything that any of the lawyers were saying." Defendant himself indicated during his plea colloquy with the trial court that he was able to hear and understand the court. This evidence, combined with other testimony at the hearing on the motion for appropriate relief, amply supports the trial court's decision denying defendant's motion in this regard.

We also conclude the trial court did not err when dismissing defendant's ineffective assistance of

counsel claim . . . . Application of [the Strickland] standard to the case before this Court establishes that defendant was not denied effective assistance of counsel. Nothing in our review of the record and transcript suggests that defendant's trial counsel failed to deliver an appropriate level of "counsel" or representation. Importantly, defendant presented no evidence at the hearing which indicated that he informed trial counsel that he was unable to hear and understand any part of the evidence or proceedings against him. This contention is meritless.

Finally, defendant argues the trial court's failure to adequately address his hearing impairment violated the Americans with Disabilities Act, 42 U.S.C. §§ 12101-213 (1997). Defendant's claim is based primarily on section 12132 of the Act, which provides that "no qualified individual with a disability shall, by reason of such disability, ... be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." A regulation promulgated under the Act elaborates this particular provision by requiring public entities to "furnish appropriate auxiliary aids and services where necessary to afford an individual with a disability an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity conducted by a public entity." 28 C.F.R. § 35.160(b)(1) (1998). Since defendant failed to produce any evidence that he was unable to hear or participate in the instant proceedings because of his alleged hearing impairment, we hold the trial court did not violate the provisions of the Americans with Disability Act during defendant's sentencing proceeding.

As previously discussed, the trial court was presented with conflicting evidence as to the extent of defendant's hearing impairment. From this evidence,

the trial court made numerous findings of fact, including the following:

> 29. At times during the trial, counsel for the defendant met with the defendant on evenings and weekends. Discussions regarding what had occurred in court were had. The defendant never indicated to his counsel that he wasn't hearing or understanding what was going on in the trial.
>
> \* \* \*
>
> 39. In open court during the arraignment and the court's inquiry from the Transcript of Plea, the defendant was able to hear and understand and respond to the questions put to him by the presiding judge.
>
> \* \* \*
>
> 65. The defendant's hearing condition was not such that he could not reasonably hear and understand the proceedings.

Our review of the record clearly indicates that the above findings of fact are amply supported by competent evidence. Assuming *arguendo* the Americans with Disabilities Act applies to defendant's situation, it is apparent the trial court complied with the provisions of the Act by providing defendant an opportunity to participate in the proceedings. The evidence does not indicate that defendant was denied participation based upon his hearing impairment. This assignment of error is without merit.

State v. Atkins, 349 N.C. 62, 111-13, 505 S.E.2d 97, 127-28 (1998).

The Court concludes that the North Carolina Supreme Court's denial of Petitioner's claim on the merits was correct and reasonable. "The Confrontation Clause of the Sixth Amendment and the Due Process Clause of the Fifth Amendment together guarantee a defendant charged with a felony the right to be present at all critical stages of his trial." United States v. Rolle, 204 F.3d 133, 136 (4th Cir. 2000). The Confrontation Clause requires the defendant's presence when testimony is presented against him at trial. United States v. Camacho, 955 F.2d 950, 953 (4th Cir. 1992) (citation omitted).[25] "'[T]he presence of a defendant is a condition of due process to the extent that a fair and just hearing would be thwarted by his absence, and to that extent only.'" United States v. Gagnon, 470 U.S. 522, 526, 105 S.Ct. 1482, 84 L.Ed.2d 486 (1985) (quoting Snyder v. Massachusetts, 291 U.S. 97, 107-08, 54 S.Ct. 330, 78 L.Ed. 674 (1934)).

---

[25]The Court notes that there is no clearly established Supreme Court law that holds that the Confrontation Clause applies in a capital sentencing proceeding. See United States v. Higgs, 353 F.3d 281, 324 (4th Cir. 2003) ("It is far from clear that the Confrontation Clause applies to a capital sentencing proceeding."). Several Courts of Appeals, however, have held that the Confrontation Clause does not apply to sentencing proceedings. See United States v. Roche, 415 F.3d 614, 618 (7th Cir. 2005) ("[W]itnesses providing information to the court after guilt is established are not accusers within the meaning of the confrontation clause."); United States v. Luciano, 414 F.3d 174, 179 (1st Cir. 2005) ("[T]here is no Sixth Amendment Confrontation Clause right at sentencing."); United States v. Martinez, 413 F.3d 239, 243 (2d Cir. 2005) (reaffirming prior holdings that the constitutional right of confrontation does not bar the admission of hearsay testimony at sentencing proceedings); United States v. Silverman, 976 F.2d 1502, 1514 (6th Cir. 1992) (en banc) (discussing the "inapplicability of the Confrontation Clause to the sentencing procedure").

As the North Carolina Supreme Court noted when it considered Petitioner's claims on direct appeal, both sides agree that Petitioner suffered some degree of hearing impairment at the time of his competency hearing, entry of plea, and sentencing trial. Atkins, 349 N.C. at 111, 505 S.E.2d at 127. Defense counsel, in fact, had historical and contemporary information that referred to hearing loss in one ear, originating in childhood, and chronic ear infections, and Petitioner's hearing impairment was offered as a mitigating factor during the sentencing proceeding. [Resp't Ex. 1 at 207].

Petitioner contends that trial counsel should have investigated the severity of his hearing loss to determine if he needed assistance with his hearing during his court proceedings. This argument must be rejected. Among the MAR court's findings of fact was that Petitioner's "hearing condition was not such that he could not reasonably hear and understand the proceedings." [Resp't Ex. 1 at 279 ¶ 65].[26] A finding of fact by a state

---

[26]Attached to Petitioner's pre-appeal MAR was an affidavit in which Petitioner states that he was unable to hear some of the proceedings. [Resp't Ex. 2 A: Atkins Aff. at ¶3]. The affidavit was attached to the pre-appeal MAR and thus complied with N.C. Gen. Stat. § 15A-1420(b)(1), which requires that an MAR made after judgment be supported by affidavits or other documentary evidence if the MAR relies on facts not ascertainable from the record. The affidavit, however, was not offered as evidence at the MAR hearing [Resp't Exs. 1 at 278 ¶ 60; Ex. 22, Vol III at 353], nor was it made part of the record on appeal that the North Carolina Supreme Court considered when adjudicating Petitioner's claim on the merits [Resp't Ex. 22, Vol. III at 353]. See e.g.,

court is presumed to be correct.  See 28 U.S.C. § 2254(e)(1).  Petitioner

may rebut that presumption only with "clear and convincing evidence."  Id.

This he has failed to do.

A defense audiologist, who tested Petitioner's hearing in November

1996 and again in March 1997, testified at the Pre-Appeal MAR hearing

that Petitioner was hearing impaired in both ears, with greater hearing loss

in the left ear.  It was her opinion that Petitioner would have heard less than

95 percent of conversational sentences[27] [Resp't Ex. 22, Vol. 1 at 138] and

therefore would not have "understood 100 percent of the information

presented" during his court proceedings [Id. at 136].  This opinion,

however, is virtually meaningless.  Until she gave her opinion, the

audiologist had testified in terms of "percentage of words and

conversational sentences understood," not in terms of "understanding the

information presented."  These are two very different concepts.  For

example, some of the "information presented" at the competency hearing

_____

State v. Adcock, 310 S.E.2d 587, 608 (1984) (noting that hearsay affidavits are
inadmissible as substantive evidence in an MAR evidentiary hearing).  AEDPA
mandates that the reasonableness of a state court's factual findings be assessed "in
light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2).
Because Petitioner's affidavit was not among the evidence presented in either state
court proceeding, this Court may not consider it.  See id.

[27]"Conversational sentences" are sentences whose words and context are
familiar to the listener.  [Resp't Ex. 22, Vol. I at 138].

and sentencing proceeding was in the form of technical expert testimony that a person even with normal hearing might not have "understood" due to unfamiliarity with the terminology or technical concepts discussed.

The audiologist's conclusion that Petitioner would have heard less than 95 percent of conversational sentences also was without context and, therefore, is meaningless.  [Resp't Ex. 22, Vol. I at 138].  The audiologist previously had testified that if a person, whether hearing impaired or with normal hearing, hears only 50 percent of the words spoken, he still can understand 95 percent of conversational sentences.  [Id. at 121-25].  In fact, according to the audiologist, the goal for assistance with a hearing aid is to enable a hearing impaired person to hear 50 percent of the words spoken, so that the majority of conversational sentences can be understood.  [Id. at 126].  In short, the audiologist's own testimony was that a person need not actually *hear* 95 percent of conversational sentences in order to *understand* them.  [Id. at 121-22, 125].  Thus, the fact that Petitioner may not have heard all of the conversational sentences spoken is not determinative of his level of understanding of the proceedings.

The defense audiologist also testified that for Petitioner to have heard 50 percent of the words and thus understood 95 percent of conversational

sentences throughout the proceedings, those words would have had to have been delivered at a level 10 decibels louder than the noise level in the courtroom at the time of the proceeding.  [Id. at 121-22, 125-26, 135]. Although an acoustical engineer testified that under simulated conditions, voices in the courtroom would have been, on average, only eight decibels louder than the background noise level [id. at 36], the MAR court found that there was no way to measure what the actual decibel level of the background noise was at the time of the competency hearing, entry of plea, or sentencing proceeding, nor was there any way to measure the actual decibel level of those who spoke during the proceedings.  [Resp't Ex. 1 at 278 ¶ 59].  Consequently, the MAR court concluded, there was no way to measure the percentage of words Petitioner was able to understand during the proceeding.

At his sentencing, Petitioner did not give his attorneys or the court any indication that he could not hear or understand the proceedings. [Resp't Ex. 22, Vol. III at 314, 362, 372-73].  When asked by the judge during the plea colloquy whether he was "able to hear and understand" the judge, Petitioner responded "yes."  [Id. at 311].  Petitioner participated in the entire plea colloquy and asked the trial judge to repeat only one

question – a compound question containing three sub-parts.[28]  [Id. at 328-

29].  Additionally, although there was no microphone in the jury box [id. at

235], Petitioner, nevertheless, participated in discussions with his attorneys

during voir dire regarding whether to keep or strike specific jurors [id. at

288, 369-70].  Lead counsel, Bill Auman, testified that throughout the trial,

Petitioner "respond[ed] and react[ed] in a way . . . that led [Auman] to

believe that [Petitioner] could hear what was going on."  [Id. at 313].

Auman testified further that the only times Petitioner indicated that he could

not hear during the proceedings was when Auman whispered something to

him, and Petitioner asked Auman to repeat himself.  [Resp't Ex. 22, Vol. II

at 284; Vol. III at 346].  Co-counsel Curtiss Graham testified that he

advised Petitioner to let him know if he had trouble hearing and that

Petitioner never complained about not being able to hear.  [Resp't Ex. 22,

Vol. III at 363].  Both attorneys also testified that they discussed the

progress of the various proceedings with Petitioner during recesses and at

the end of the day, and he never gave any indication that he had been

---

[28]Petitioner notes that his attorneys went over the plea colloquy with him at least three times before he entered his plea, implying that he was relying on his memory of the questions, not his hearing, when going through the plea colloquy with the trial judge. [Doc. 10 at 50, ¶ 154].  The fact that Petitioner asked the judge to repeat the compound question indicates, however, that he was listening to the questions and responding to what he heard in the courtroom and not just relying on what he remembered from his prior discussions with his attorneys.  [Resp't Ex. 22, Vol. III at 328-29].

unable to hear or understand what was going on in court.  [Id. at 313-15,

372].  Petitioner did not present any evidence at the MAR hearing that he

complained to his attorneys about being unable to hear or understand the

proceedings.

Petitioner has failed to show by clear and convincing evidence that

the MAR court erred in finding that he could reasonably hear and

understand the proceedings.  See 28 U.S.C. § 2254(e)(1).  Furthermore,

Petitioner has failed to demonstrate that there is a reasonable probability

that had assistance for his hearing been provided, the outcome of the

competency hearing or sentencing hearing would have been different.  See

Strickland, 466 U.S. at 694, 104 S.Ct. 2052.  Consequently, the North

Carolina Supreme Court's rejection of this claim was neither contrary to nor

an unreasonable application of clearly established federal law.  See 28

U.S.C. § 2254(d)(1).


**V.  CONCLUSION**

Based upon the record of the state proceedings and the relevant

legal precedent, the Court finds that Petitioner is not entitled to any relief

and, therefore, his § 2254 Petition must be denied and dismissed.  The

Court further finds that the Petitioner has not made a substantial showing of a denial of a constitutional right.  28 U.S.C. § 2253(c)(2); <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 336-38, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003) (in order to satisfy § 2253(c), a petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong) (citations omitted).  As a result, the Court declines to issue a certificate of appealability.  Rule 11(a), Rules Governing Section 2254 Cases in the United States District Courts.

## O R D E R

For the foregoing reasons, **IT IS, THEREFORE, ORDERED** that:

1.  Petitioner's Amended Petition for Writ of Habeas Corpus [Doc. 10] is **DENIED**;

2.  Respondent's Motion for Summary Judgment is **GRANTED** [Doc. 19]; and

3.  Petitioner's Motion for Summary Judgment [Doc. 28] is **DENIED**.

**IT IS FURTHER ORDERED** that this case is **DISMISSED**.  A Judgment consistent with this Order shall be entered simultaneously

herewith.

**IT IS SO ORDERED.**

Signed: August 16, 2011

Martin Reidinger
United States District Judge